Loretta ROLLAND, et al., Plaintiffs,

v.

Argeo Paul CELLUCCI,
et al., Defendants.

No. Civ.A. 98–30208–KPN.

United States District Court,
D. Massachusetts.

June 4, 1999.

Richard D. Belin, Nima R. Eshghi, Foley, Hoag & Eliot, Boston, MA, Steven J. Schwartz, Center for Public Representation, Northampton, MA, Cathy E. Costanzo, Center for Public Representation, Northampton, MA, Stacie B. Siebrecht, Matthew Engel, Disability Law Center, Boston, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Boston, MA, Christine M. Griffin, Disability Law Center, Boston, MA, for plaintiffs.

Judith S. Yogman, Attorney General's Office, Government Bureau, Boston, MA, H. Gregory Williams, Attorney General's Office, Springfield, MA, Rosemary S. Gale, Assistant Attorney General, Boston, MA, for defendants.

*MEMORANDUM REGARDING DEFENDANTS' MOTION TO DISMISS (Docket No. 33) and DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT (Docket No. 55)*

NEIMAN, United States Magistrate Judge.

This class action suit involves seven representative plaintiffs and two organizational plaintiffs, ARC Massachusetts ("ARC") and Stavros Center for Independent Living ("Stavros") (collectively "Plaintiffs"). In their complaint, as amended, Plaintiffs claim a violation of the integration mandate of the Americans with Disabilities Act (Count I), disability discrimination in violation of the Americans with Disabilities Act (Count II), violations of various Medicaid provisions including comparability, reasonable promptness, freedom of choice, services to developmentally disabled, services to nursing home residents (Count III through VII, respectively), and a violation of the Nursing Home Reform Amendments (Count VIII). Plaintiffs seek injunctive and declaratory relief from the Governor of Massachusetts ("Governor"), the Secretary of the Executive Office of Administration and Finance ("A & F"), the Secretary of the Executive Office of Health and Human Services ("EOHHS"), the Commissioner of the Division of Medical Assistance ("DMA"), the Commissioner of the Department of Mental Retardation ("DMR"), the Commissioner of the Massachusetts Rehabilitation Commission ("MRC"), the Commissioner of the Department of Public Health ("DPH"), and the Director of Region I for the Department of Mental Retardation ("Reg I").

Defendants now seek to dismiss the entirety of the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In essence, Defendants contend that 42 U.S.C. § 1983 provides no redress for violations of the various statutory provisions under which Plaintiffs seek vindication. For the reasons set forth below, Defendants' motion will be denied.

## I. *STANDARD OF REVIEW*

A motion to dismiss under Rule 12(b)(6) is designed to test whether the complaint properly states a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). When assessing a Rule 12(b)(6) motion, a court does not weigh the evidence which might be presented at trial, but merely determines whether the complaint itself is legally sufficient. *Kusek v. Family Circle*, 894 F.Supp. 522, 527 (D.Mass.1995); *Duncan v. Santaniello*, 900 F.Supp. 547, 553 (D.Mass.1995). In carrying out this function, a court must accept "the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." *Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir.1992). *See Pihl v. Massachusetts Dep't of Educ.*, 9

F.3d 184, 187 (1st Cir.1993). However, the court "need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990). The appropriate inquiry is whether, based on the allegations of the complaint, Plaintiffs are entitled to offer evidence in support of their various causes of action. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## II. *DISCUSSION*

■ It is well-settled that section 1983 is an available remedy for claimed violations of federal statutes as well as violations of the Constitution, *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), except "where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges or immunities within the meaning of § 1983." *Suter v. Artist M.,* 503 U.S. 347, 355, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (quoting *Wright v. City of Roanoke Redev. and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The threshold test of whether a statute creates such enforceable procedural and substantive rights within the meaning of section 1983 is "whether [it] was intend[ed] to benefit the putative plaintiff[s]." *Visiting Nurse Ass'n of North Shore Inc. v. Bullen,* 93 F.3d 997, 1002–03 (1st Cir.1996) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). "If so, the provision creates an enforceable right unless it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Id.* (internal citations omitted).

Defendants concentrate much of their motion on two factors within this enunciated test. They first argue that the various statutes at issue contain precatory rather than mandatory pronouncements, making the rights contained within them merely aspirational and thus unenforceable by Plaintiffs as a matter of law. Second, Defendants maintain that the statutory provisions at issue are simply too vague and amorphous to be amenable to judicial enforcement.

### A. *Substantive Issues*

Defendants' assertions with respect to the various statutory claims made by Plaintiffs will be addressed *seriatim.*

#### 1.

■ Defendants first seek to dismiss those claims grounded in the Nursing Home Reform Amendments ("NHRA"), 42 U.S.C. § 1396r, which, in Plaintiffs' estimation, require the provision of "specialized services" to the mentally retarded and developmentally disabled class members, whether residing in or out of a nursing home. The relevant statutory provision requires that specialized services be provided "[i]n the case of a resident who is determined ... not to require the level of services provided by a nursing facility, but to require specialized services for ... mental retardation." 42 U.S.C. § 1396r(e)(7)(C)(i)(IV) and (iii)(III). In essence, Defendants aver that a section 1983 claim is an inappropriate vehicle to vindicate Plaintiffs' claimed NHRA rights given that the term "specialized services" is so inherently vague and amorphous as to allude judicial enforceability. Moreover, Defendants assert, neither the NHRA, nor its enabling regulations impose an enforceable duty upon them to provide specialized services to individuals residing *in* nursing facilities as a matter of law.

The parties fundamentally agree that the NHRA was enacted to quell overutilization of nursing home care for those who are not in need of institutionalization. To accomplish this goal, the NHRA devised a preadmission screening process ("PA-

SARR") to be administered by the appropriate state agency, in this case the DMR, pursuant to relevant state and federal statutes and supporting regulations. *See* 42 U.S.C. § 1396r(e)(7)(B)(iv); M.G.L. ch. 123B. The parties also agree that the NHRA mandates that a state provide specialized services to those individuals who are determined through PASARR *not* to need treatment in a residential nursing facility. Otherwise, the parties' respective interpretations of the NHRA diverge.

Plaintiffs maintain that the PASARR provisions create an affirmative duty for Defendants to provide specialized services and active treatment for individuals regardless of their residence. In counterpoint, Defendants maintain that the NHRA requires the state to render specialized services only in the event an individual does *not* require nursing home care.

It does not appear to the court that the statutory language precludes the provision of specialized services to nursing home residents. It is clear that, at a minimum, the PASARR review is employed to determine "whether the resident [of a nursing facility who is] mentally retarded or developmentally disabled requires specialized services for mental retardation." 42 U.S.C. § 1396r(e)(7)(B)(ii). In fact, the statute directs the Secretary of the Health and Human Services ("Secretary") to promulgate regulations to make these determinations. Defendants concede as much. Defendants also acknowledge that the regulations promulgated at the direction of the Secretary by the Health Care Financing Administration ("HCFA") contemplate that a PASARR evaluation may determine that an individual requires both nursing home level care and specialized services. 57 Fed.Reg. 56,477 (Nov. 30, 1992). *See* 42 C.F.R. § 483.130(n).

Despite the plain language of the implementing regulations, Defendants argue that courts are generally reluctant to imply a right of action under section 1983 from a regulation, as opposed to a statutory provision. Moreover, Defendants contend, the regulations go beyond the statutory scope of authority and are not amenable to judicial review and enforcement. At bottom, Defendants dispute that an enforceable obligation to provide specialized services for nursing facility residents arises from the NHRA itself. While they admit that no court has so held, Defendants maintain that Plaintiffs' claims under the NHRA should be dismissed in the absence of any evidence that Congress specifically intended to create a judicially enforceable right to specialized services. At best, Defendants maintain, the regulations are merely precatory. Finally, Defendants argue that the term "specialized services" is too nebulous and ill-defined to be suited to any type of judicial enforcement. For the reasons which follow, Defendants' assertions fail at this juncture.

As already stated, the statute makes clear that the PASARR review may be utilized to determine whether a resident of a nursing facility, who is mentally retarded or developmentally disabled, requires specialized services. It does not preclude the provision of those services within a nursing home setting. Thus, the Secretary's implementing regulations are well within the statute's scope. Moreover, there does not appear to be any legal authority for the notion that appropriately promulgated regulations cannot create enforceable federal rights. In particular, the court finds section 1983 to be an appropriate vehicle to vindicate NHRA-based rights and Plaintiffs have made a sufficient claim for relief thereunder. (Am.Compl.¶¶ 121, 193–195.)

In addition, the court finds that relevant sections of the statute, together with the implementing regulations, are sufficient to define the contours of specialized services and, thus, Plaintiffs' claim in this regard. The regulations define specialized services in great detail and include all of the services necessary to provide active treatment, a term the court understands to be used interchangeably with the term specialized services. 42 C.F.R. § 483.120 and

483.440(a). At a minimum, it would seem that the regulations form the requisite standard of care. Interestingly enough, Defendants proffer that Massachusetts generally complies with these regulations. That proffer signals the court that Defendants have not found the term "specialized services" as completely ill-defined as their arguments might suggest.

Concededly, the question of judicial enforcement of the NHRA is for another day. As Defendants assert, it may well be beyond the court's purview to craft a detailed remedial scheme to address the alleged lack of specialized services to nursing home residents. However, with the use of knowledgeable health professionals to determine necessary services, such endeavors have been undertaken in the past by other courts in this and other districts. *See Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (once a court determines that "reasonable" habilitation must be provided in a mental health setting, what amounts to "reasonable" habilitation is best determined by qualified professionals and not by the court); *Ricci v. Okin,* 537 F.Supp. 817, 826 (D.Mass.1982) (the court undertook the obligation to determine the level of staffing necessary to assure compliance with its decree by relying on the guidance of a federal department of Health and Human Services personnel professional); *Brewster v. Dukakis,* 520 F.Supp. 882, 886 (D.Mass.1981) (the powers and responsibilities of the court in this class action with 2,135 plaintiffs was to supervise implementation of the negotiated agreement of the parties derived from the work of professionals in the mental health field). *See also Martin v. Voinovich,* 840 F.Supp. 1175, 1202 (S.D.Ohio 1993).

Accordingly, the court will deny Defendants' motion to dismiss the NHRA claims contained in Count VIII of Plaintiffs' amended complaint.

### 2.

Plaintiffs also proceed under two portions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* one calling for the integration of disabled individuals into the mainstream of American life, the other guarding against certain forms of discrimination.

### a.

Generally speaking, the ADA was intended to remedy the problem of unequal treatment of disabled persons. The ADA's integration mandate states that, ". . . no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In implementing the statute at the direction of Congress, the Attorney General promulgated a regulation which provides in pertinent part that "[a] public entity shall administer services programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

■ Defendants first argue that Plaintiffs fail to state a claim under the ADA's integration mandate. Given the paucity of conflicting precedent and the fact that the Supreme Court has recently heard oral argument on and is now considering this discrete issue, Defendants' claim may be dealt with relatively quickly. *See L.C. by Zimring v. Olmstead,* 138 F.3d 893 (11th Cir.1998). In short, the court believes that Plaintiffs have sufficiently presented their integration claim to survive Defendants' motion to dismiss.

The complaint alleges that Plaintiffs are "qualified individuals with disabilities" bringing them within the coverage of the ADA either directly or pursuant to section 1983. (*See* Am.Compl. ¶¶ 6, 15–21, 98, 112.) Other courts have so held, *L.C. by Zimring,* 138 F.3d at 897; *Helen L. v. DiDario,* 46 F.3d 325, 333–34 (3rd Cir. 1995), and this court agrees.

In the court's opinion, Plaintiffs have also sufficiently alleged judicially enforceable rights, namely, that they unnecessarily receive services in an institutional rather than an integrated setting and that Defendants have failed to provide community services even when such services are most appropriate to Plaintiffs needs. (Am. Compl.¶¶ 1, 3, 6, 8, 60, 108.) The court finds it immaterial, at this juncture, that many Plaintiffs reside in private rather than public nursing facilities. Defendants apparently do not dispute that they still have obligations in accordance with the ADA. 28 C.F.R. § 35.130(b); *Helen L.,* 46 F.3d at 325; *Kathleen S. v. Dep't of Pub. Welfare of Comm. of Pa.,* 10 F.Supp.2d 460, 467 (E.D.Pa.1998).

Defendants' assertion, that Congress could not have meant to require a state to provide community services where a state has insufficient resources to "satisfy the entire demand for such services," *Williams v. Secretary of the Executive Office of Human Servs.,* 414 Mass. 551, 609 N.E.2d 447, 452 (1993), does little to advance their claim that they have no duty to provide community services as a matter of law. The Third Circuit's opinion in *Clark v. Cohen,* 794 F.2d 79 (3d Cir.1986), upon which *Williams* relied, was later clarified by the Third Circuit itself. *Clark,* which denied relief based on the ADA and the Rehabilitation Act and found no affirmative obligation for the state to furnish services, was explicitly *not* based on the integration mandate of the ADA. *Helen L.,* 46 F.3d at 333–34. *See also L.C. by Zimring,* 138 F.3d at 897 ("where, as here, the State confines an individual with a disability in an institutionalized setting when a community placement is appropriate, the State has violated the core principle underlying the ADA's integration mandate."). The *L.C.* court also concluded that a state may not abdicate its duty to provide community placement, where appropriate, by claiming a lack of resources. *Id.* at 902. When a defendant seeks to raise what amounts to a cost defense, the court determined, it may only do so in limited circumstances where making the accommodations "'would fundamentally alter the nature of the service, program, or activity.'" *Id.* (quoting 28 C.F.R. § 35.130(b)(7)).

In the present matter and at this phase in the litigation, the court cannot find as a matter of law that Plaintiffs have requested services that would require a fundamental alteration to the system. *Compare Heartz v. Morton,* No. 98–317–B (D.N.H. Feb. 24, 1999) (the court determined through a fact-intensive analysis, at the preliminary injunction stage in the litigation, that the plaintiffs care in a three person community home designed to treat acquired brain disorder was so costly as to create a fundamental alteration in the system). That question must be reserved for another day. Because the integration mandate has been found in the past to create a judicially enforceable right, this court is unwilling to find that no such right exists as a matter of law. Naturally, Defendants have the right to renew this objection after the United States Supreme Court has spoken on the issue. At present, however, Plaintiffs' claim pursuant to the integration mandate, Count I, will be allowed to proceed forward.

b.

■ Plaintiffs also proceed under the nondiscrimination provision of the ADA, which provides a cause of action to any qualified individual with a disability—be it mental retardation, developmental or any other—who is denied participation in or the benefit of a public program because of that disability. 42 U.S.C. § 12132. The pertinent parts of the enabling regulation provide as follows:

(b)(1) A public entity, in providing any aid, benefit or service, may not . . . on the basis of disability—

(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service; . . .

(iv) provide different or separate aids, benefits, or services to individuals with

disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others.

28 C.F.R. § 35.130(b).

■ Plaintiffs cite many cases for the proposition that the ADA prohibits a public entity from discriminating on the basis of disability in the provision of community based treatment and services. *See, e.g., Helen L.*, 46 F.3d at 336; *Cable v. Dep't of Dev. Servs.*, 973 F.Supp. 937, 942 (C.D.Cal. 1997); *Williams v. Wasserman*, 937 F.Supp. 524, 530 (D.Md.1996). Still, as Defendants assert, Plaintiffs must first allege and then prove that they are "qualified" disabled individuals within the meaning of the statute in order to assert a deprivation of rights thereunder. Moreover, the ADA explicitly recognizes that a public entity may impose eligibility requirements on the provision of services to disabled individuals. *Easley by Easley v. Snider*, 36 F.3d 297, 302 (3d Cir.1994).

Plaintiffs allege in their amended complaint that "many of the named plaintiffs and other members of the plaintiff class are currently entitled to active treatment and other services in ICF/MRs." (Am. Compl.¶ 78.) Various class members are also allegedly qualified to receive services through the home and community based waiver ("HCBW") program. (Am. Compl.¶¶ 190–192.) Finally, Plaintiffs allege, even if they fail to meet eligibility requirements for such services, they could meet those requirements with reasonable modifications in the "policies, practices or procedures," as are contemplated by implementing regulations of the ADA. *See* 28 C.F.R. § 35.130(b)(7). *See also* 42 U.S.C. § 12131(2).

The court cannot say, as a matter of law and based solely on the allegations in the complaint, that the claimed exclusion of Plaintiffs from community-based treatment in intermediate care facilities for the mentally retarded ("ICF/MR") and from HCBW services, as Plaintiffs allege, are grounded upon nondiscriminatory reasons, as Defendants assert. The court finds sufficient factual predicates to support the claimed violations to withstand the motion to dismiss now before the court. As Defendants must *per force* acknowledge, an exclusion from services may be actionable whether or not the public entity intended to discriminate. Otherwise, this nondiscrimination provision would be rendered meaningless. *See L.C. by Zimring*, 138 F.3d at 902; *Tyler v. City of Manhattan*, 118 F.3d 1400, 1407 (10th Cir.1997); *Martin*, 840 F.Supp. at 1191–92. The court will therefore deny Defendants' motion to dismiss Count II.

### 3.

Defendants also seek to dismiss Plaintiffs' claims under various parts of the Medicaid statute, namely, the comparability, the reasonable promptness and the freedom of choice provisions.

### a.

■ The comparability provision requires that all Medicaid services, except those services provided under the HCBW program be furnished equitably. Accordingly, similarly situated individuals, whether they be categorically needy—that is, receiving Supplemental Security Income as claimed with regard to the entire plaintiff class—or medically needy, must receive comparable services. 42 U.S.C. § 1396a(a)(10)(B); *Schweiker v. Hogan*, 457 U.S. 569, 573–74, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982). Some courts have also held that the comparability provision is violated if there is a disparity of treatment among the categorically needy even when those individuals have differing disabilities. *See White v. Beal*, 555 F.2d 1146, 1151–52 (3d Cir.1977); *Parry By and Through Parry v. Crawford*, 990 F.Supp. 1250, 1257 (D.Nev.1998). *See generally Sobky v. Smoley*, 855 F.Supp. 1123, 1140–41 (E.D.Cal.1994) (citing cases).

Defendants' motion to dismiss Plaintiffs' comparability claims is grounded in their assertion that the class members have no appropriate comparator. Accordingly, Defendants claim, Plaintiffs cannot be deemed to have been denied services provided to others who are similarly situated, a prerequisite for redress under this provision. Specifically, Defendants contend that the needs of the various class members are extremely individualized and these "individual needs are vastly different from each other and, therefore, are likely to be vastly different from the persons who are receiving the services that the plaintiffs seek to require the defendants to provide." (Def.Mem. (Docket No. 37) at 23.) As a result, Defendants maintain, Plaintiffs' claims do not rise to the level of judicially enforceable rights and must be dismissed.

In support, Defendants also cite *King by King v. Fallon*, 801 F.Supp. 925, 934 (D.R.I.1992). After a full bench trial, the *King* court rejected claims of unequal provision of Medicaid services. The court concluded that plaintiffs failed to provide sufficient evidence "to contravene Defendants' assessments of the various Plaintiffs' medical needs." *Id.* As a result, the court determined that it "simply ha[d] no basis for comparing the haves with the have-nots." *Id.* Defendants contend that they are entitled to the same result here. As is evident, however, the case at bar is in a significantly different procedural posture, no trial having yet occurred. Suffice it to say, at this point in time Plaintiffs have pled their claim sufficiently. (Am. Compl.¶¶ 63–66, 72–78.)

The court is similarly unconvinced that the distinction which Defendants seek to draw between this case and *Sobky* is material for purposes of their motion to dismiss. As Defendants maintain, the harms claimed by the plaintiff class in *Sobky* were undoubtedly exacerbated by the fact that the class members, although eligible, received no Medicaid-funded methadone treatment services whatsoever. Here, Defendants point out, there is no dispute that the members of Plaintiff class are receiving varying Medicaid services. In the court's opinion, that difference is not dispositive.

At the very core of both *Sobky* and Plaintiffs' claims here are allegations that the respective states failed to provide certain necessary Medicaid services. The instant complaint alleges that eligible individuals, with similar degrees of impairment, albeit different disabilities, are not receiving equal access to Medicaid. In particular, Plaintiffs claim that individuals residing in ICF/MRs receive active treatment to prevent them from losing certain important skills, while those individuals residing in nursing facilities are not receiving ample services. (Am.Compl.¶ 52, 72–78.) Similarly, Plaintiffs contend that the state excludes eligible individuals with cognitive as opposed to physical disabilities from its Personal Care Attendant ("PCA") services. (Am.Compl.¶¶ 62–66.) At bottom, Plaintiffs' complaint supports a cognizable claim of a violation of the comparability provision of Medicaid, Count III.[1]

b.

■ Defendants also seek to dismiss Plaintiffs' claim that they have violated Medicaid's reasonable promptness provision. Defendants' argument parallels their arguments with respect to the other statutory provisions which Plaintiffs seek to enforce under section 1983. In essence, "[t]he relevant question is whether the action ... whose reasonableness is commanded has been clearly delineated and is

---

1. With regard to Defendants' challenge, specific to this claim, to Plaintiffs' standing, it appears to the court that Plaintiffs have also sufficiently alleged that certain class members are being deprived specialized services in general and ICF/MR services in particular in violation of the Medicaid act. There appears to be sufficient injuries-in-fact pled to provide the necessary standing at this juncture. It is of no moment that some individual class members may not want ICF/MR services.

susceptible of judicial enforcement." *Sobky*, 855 F.Supp. at 1147 (quoting *Albiston v. Maine Comm'r of Human Servs.*, 7 F.3d 258, 267 (1st Cir.1993)).

The relevant portion of the Medicaid statute, 42 U.S.C. § 1396a(a)(8), provides that "[a] state plan for medical assistance must ... provide that all individuals wishing to make an application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." The implementing regulations make clear that no undue delay may occur in the application process for services. 42 C.F.R. § 435.911(a)(1), (2) and (e)(1).

Their previous arguments to the contrary, Defendants more or less concede in their supplemental memorandum, (Docket No. 56), that the reasonable promptness provision extends beyond the application process itself to the provision of services as well. *See Doe By and Through Doe v. Chiles*, 136 F.3d 709, 721 (11th Cir.1998). Likewise, the reasonable promptness provision has been held to apply to services which a state has opted to provide, not just those services which are federally mandated. *Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir.1997). Only when a state seeks a necessary waiver from provision of certain services may it be excused from compliance with the reasonable promptness portion of the statute, at least in part. 42 U.S.C. §§ 1396n(c)(4)(A) and (c)(3) and (9).

Looking to the four corners of the complaint, the court can plainly see that Plaintiffs have adequately alleged that Defendants have not sought the necessary waiver of the reasonable promptness requirement. (Am.Compl.¶ 85.) Plaintiffs also allege that at least nine hundred class members have not been provided medically necessary services in a timely manner. (Am.Compl.¶¶ 106, 108.) Granted, before receiving redress, Plaintiffs must prove that the services alleged to have been untimely provided were *unrea-*

*sonably* untimely. At this point in the litigation, however, it is too early to make that determination. The court will therefore allow the claim in Count IV to go forward.

### c.

■ Plaintiffs assert that the individual class members remain in nursing facilities at present and have not been informed of existing alternatives to nursing facilities in violation of the pertinent freedom of choice provisions of the Medicaid statute. The pertinent statutory language provides that "... such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded...." 42 U.S.C. § 1396(c)(2)(C).

In response, Defendants aver that Plaintiffs' allegations fail to state a cognizable claim. At the core of Defendants' argument is the assertion that there are no feasible alternatives available which are presently denied to eligible claimants. Indeed, the Medicaid statute requires a state to provide only feasible alternatives and allows it broad latitude to choose the appropriate services for the appropriate claimant. *Alexander*, 469 U.S. 287, 307, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Even giving the case law a most generous reading in Plaintiffs' favor, Defendants argue, the freedom of choice provision does not offer the broad affirmative mandate which Plaintiffs suggest. *See Martinez v. Ibarra*, 759 F.Supp. 664, 669 (D.Colo.1991) ("The first requirement forces states to disclose care options accurately to potential recipients Those alternatives must be feasible."). Rather, Defendants asserts, the statutory provision appears instead to be a "negative command of non-interference" with an individual's available choices. *King*, 801 F.Supp. at 932. If, for example,

a choice is, economically or logistically infeasible, Defendants continue, the state need not create availability where it simply does not exist.

Despite Defendants' arguments, it is the court's opinion that Plaintiffs have pled sufficient facts to survive Defendants' motion to dismiss the freedom of choice claims. In their amended complaint, Plaintiffs allege that there are a number of feasible alternatives to nursing facility care available in Massachusetts, namely, "residential habilitation, day services, family support, respite services and transportation." (Am.Compl.¶ 187.) Plaintiffs also adequately allege that "Defendants' administration of the Medicaid program denies plaintiffs and plaintiff classmembers their freedom of choice by failing to inform them of the feasible alternatives to Medicaid-funded nursing facilities, including ICF/MR, PCA and HCBW programs, and failing to implement their choices for Medicaid services, all in violation of 42 U.S.C. § 1396n(c)(2)(C)." (Am.Compl.¶ 188.)

The breadth of the freedom of choice provision remains to be seen. It likewise remains to be demonstrated whether the programs which Plaintiffs allege to have been denied are, in fact, feasible alternatives to nursing facility care. If those claims cannot be substantiated, Defendants' assertion that Plaintiffs are calling for an inappropriate expansion of various programs will become palpable. At this point in the litigation, however, there are sufficient allegations that some feasible alternatives to nursing facilities exist and that Plaintiffs are being denied a meaningful choice as to their participation therein. Accordingly, the court will deny Defendants' motion to dismiss as it relates to Count V.[2]

### B. Jurisdictional Issues

#### 1.

 Plaintiffs rely on *Bogard v. Kustra*, No. 88–C–2414 (N.D.Ill. May 4, 1980),

for the proposition that the organizational plaintiffs, ARC and Stavros, have standing to pursue the instant claims on their own behalf. *See also Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In *Bogard*, an organization similar to ARC was found to have standing to pursue claims much like those advanced here. Recently, however, the doors to the federal courts have been closing to increasing numbers of organizations. As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded but is ordinarily 'substantially more difficult' to establish."

 Relying on *Lujan*, Defendants assail the claims made by the organizational Plaintiffs, maintaining that they have no standing to pursue their claims as they themselves have suffered no injury-in-fact, a necessary prerequisite for organizational standing. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. To have standing, whether based on an associational or representative theory, an organizational plaintiff must plead specific facts that will demonstrate, if proven, the existence of a harm that "directly" affects one or more of its members. *Id.* at 563, 112 S.Ct. 2130 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

In the court's estimation, Plaintiffs' pleadings meet the standards set forth in *Lujan*. As to ARC, Plaintiffs have pled that it "is a statewide non-profit organization comprised of persons with mental retardation, their parents and friends, and mental retardation professionals...." (Am.Compl.¶ 22.) In addition, Plaintiffs

---

2. Defendants' assertions at oral argument notwithstanding, Plaintiffs have not conceded a lack of viability with regard to their claims in Counts VI and VII. Since Defendants do not wage an independent attack with regard to these counts in their motions to dismiss, the court will allow those claims to go forward.

assert that "ARC Massachusetts is dedicated to ensuring that all citizens with mental retardation in the Commonwealth are afforded appropriate services and supports in the most integrated, home-like setting possible, and that all persons with mental retardation and other developmental disabilities and their families have meaningful choices about the nature and location of those services. ARC Massachusetts, as a statewide advocacy organization, has long monitored the actions of the defendants in order to ensure that persons with mental retardation and other developmental disabilities receive the services to which they are entitled." (Id.) To the extent that Plaintiff class members are also members of ARC, they have already been determined to have alleged sufficient injury as described in *Lujan*.

As to Stavros, Plaintiffs assert that it assists individuals living in the community by using federal and state funds to provide services to increase their independence. In this capacity, "Stavros is required to file annual reports concerning the number of persons who they assist to move from institutions to community with the Rehabilitation Services Administration ("RSA"), the federal agency responsible for independent living centers." (Am.Compl.¶ 23.) According to Stavros, its funding is determined by the RSA and Defendants have impeded its ability to carry out federal mandates and have jeopardized its funding. (Id.) While it remains to be seen whether Stavros has suffered a quantifiable harm, as required by *Lujan*, at this juncture Plaintiffs have, at a minimum, pled that it has.

■ The court also does not agree with Defendants that Plaintiffs have conceded that the requirement of "individualized proof" of necessary relief defeats their claims of organizational standing. While it is true that "associational standing is properly denied where ... the need for individualized proof so pervades the claim that the furtherance of the members' interests requires individual representation," *Con-*

*cerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 884 F.Supp. 487, 489 (S.D.Fla.1994), that is not the case here.

The court has already determined that Plaintiffs' claims are appropriate, if not preferable, for class-based adjudication, making individual representation unnecessary. While each class member may require an individual needs assessment were relief granted, this is not a claim which requires individualized proof as to the claimed violations or compliance with the various statutes at issue. *Cf. id.* at 489. Nor is this a case in which Plaintiffs seek to "shoehorn" an unascertainable number of victims into their claim by way of organizational standing. *Id.* Again, the court made a determination to the contrary when it allowed Plaintiff's motion to certify a class. In sum, the court finds that ARC and Stavros have standing.

2.

■ Finally, Defendants assert that the pleadings are insufficient to support a cognizable claim against various named defendants, including the Governor, A & F, EOHHS, a DMR regional Director, DPH and MRC, insofar as they are not named in any pertinent counts of the complaint. Accordingly, Defendants ask that the claims against those defendants be dismissed as they cannot be deemed aware of the precise nature of the cause of action brought against them as is required by Federal Rule of Civil Procedure 8(a).

Rule 8(a) necessitates a short plain statement of the basis for relief. While the court agrees that the original complaint was rather thin as to several defendants, the court finds sufficient facts in Plaintiffs' amended complaint to apprise all Defendants of the claims against them. (Am.Compl.¶¶ 25, 31(a), 41(a) and (b), 42(a), 99(a).) Given the notice-pleading standard, there can be little dispute at this juncture that Defendants are, at the very least, on notice of the claims advanced.

The court is also unconvinced by Defendants' substantive challenge to the inclusion of the Governor and EOHHS as defendants to certain of Plaintiffs' claims. In essence, Defendants assert that, because a single state agency, the DMA, is responsible for compliance with the Medicaid statutes, the Governor and EOHHS have no role whatsoever in the supervision and administration of the state's Medicaid plan. Accordingly, Defendants claim, the Governor and EOHHS are impermissible defendants as to all counts except those regarding the ADA, Counts I and II.

The single state agency mandate arose out of Congress' desire to minimize the improper denial of benefits and to ensure a certain level of services and quality of care. *Morgan v. Cohen,* 665 F.Supp. 1164, 1177 (E.D.Pa.1987). The mandate accomplishes these goals by limiting the authority to make administrative decisions to a single state agency. 42 C.F.R. § 431.10(e)(1)(ii). However, while the "single state agency" requirement derives from a desire to focus accountability for plan operation, *Hillburn by Hillburn v. Maher,* 795 F.2d 252, 261 (2d Cir.1986); 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.1 and 431.10, it strains reason to conclude here that it is only DMA which may be held responsible as a matter of law for failures necessarily attributable to other state agencies. *See generally King by King v. Sullivan,* 776 F.Supp. 645, 656–57 (D.R.I.1991).

The court cannot imagine that such a narrowly drawn requirement was intended to foreclose any recourse when other public entities may be found to have violated federal law. Stated another way, if an official fails to enforce the various statutory provisions which will ensure the delivery of needed services within his or her authority, that official should be held accountable for the failure. Those cases cited by Defendants and still others found by the court do not indicate otherwise. No case holds that the provision which empowers a single state agency to administer a state's Medicaid program was in any way promulgated with the intention of exonerating or limiting the liability of other governmental officials who fail to conform their required actions to federal law.

Of course, it remains to be seen whether Plaintiff can prove that the Governor and EOHHS have a role in the provision of Medicaid services above and beyond the role of the DMA. Granted, at this point, the full extent of duties of each official in the context of the intertwined provisions of federal law is unclear to the court. Still, Plaintiffs have pled at least that several unfulfilled administrative duties may fall outside the DMA's mandate. By way of example, Plaintiffs assert that the Governor "is responsible for seeking funds from the legislature as well as directing, supervising and controlling the executive departments of state government." (Am. Compl. ¶ 24.) He also appoints all the directors of the executive agencies. (Id.) Similarly, EOHHS is alleged to be "responsible for the oversight, supervision, and control of the health and human services departments within the executive branch including DMA" and the other Defendants. (Am.Compl.¶ 26.) To the extent that those responsibilities go beyond those enumerated and required in the state Medicaid plan, the Governor and EOHHS may well be appropriate defendants as to those counts. Again, at a minimum, there appears to be no dispute that they are appropriate defendants with regard to the ADA.

## III. *CONCLUSION*

For the foregoing reasons, the court will deny Defendants' motion to dismiss in its entirety.