Loretta ROLLAND, et al., Plaintiffs,

v.

Argeo Paul CELLUCCI,
et al., Defendants.

No. Civ.A. 98–30208–KPN.

United States District Court,
D. Massachusetts.

Jan. 10, 2000.

Richard D. Belin, Nima R. Eshghi, Foley, Hoag & Eliot, Boston, MA, Steven J. Schwartz, Northampton, MA, Cathy E. Costanzo, Northampton, MA, Stacie B. Siebrecht, Matthew Engel, Boston, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Boston, MA, Christine M. Griffin, Boston, MA, for plaintiffs.

Peter T. Wechsler, Attorney General's Office, Boston, MA, Kristi A. Bodin, Office of Attorney General, Springfield, MA, Judith S. Yogman, Attorney General's Office, Government Bureau, Boston, MA, H. Gregory Williams, Attorney General's Office, Springfield, MA, Ginny Sinkel, Office of the Attorney General, Government Bureau, Boston, MA, Rosemary S. Gale, Assistant Attorney General, Boston, MA, for defendants.

### MEMORANDUM WITH REGARD TO APPROVAL OF SETTLEMENT AGREEMENT (Docket No. 115)

NEIMAN, United States Magistrate Judge.

The parties have entered into a proposed settlement involving a certified class of "adults with mental retardation and other developmental disabilities in Massachusetts who resided in ... nursing facilities on or after October 29, 1998, or who are or should be screened for admission to nursing facilities." (Order of Class Certification (Docket No. 49); see Mem. and Order with Regard to Pls.' Mot. for Class Certification (Docket No. 48).) At issue is the parties' joint request that the court, in accord with FED.R.CIV.P. 23(e), determine that their proposal is fair, adequate and reasonable. In making this determination, the court must compare the substantive terms of the agreement with the likely results of the trial and consider the negotiating process by which the settlement was reached. *See Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 67

(D.Mass.1997); *Weinberger v. Kendrick,* 698 F.2d 61, 69 (2d Cir.1982).

For the reasons which follow, the court finds that the proposed settlement is fair, adequate and reasonable under the circumstances and hereby orders its approval. In so finding, the court affirms its preliminary ruling that the interests of the class as a whole would be better served if the litigation were resolved through the proposed settlement rather than pursued through trial. (See Preliminary Finding of Fairness and Scheduling Order ("Prelim. Finding") (Docket No. 117).)

## I. *BACKGROUND*

After attempting to resolve their claims directly with the Commissioner of the Massachusetts Department of Mental Retardation ("DMR") over a period of at least six months, Plaintiffs filed the present lawsuit on October 29, 1998, seeking broad systemic relief on behalf of all persons with mental retardation or other developmental disabilities who were, had been, or would be residents of nursing facilities in the Commonwealth. The suit was brought on behalf of seven individuals and two organizations, ARC Massachusetts ("ARC") and the Stavros Center for Independent Living (collectively "Plaintiffs"). In their complaint, as amended, Plaintiffs set forth a number of claims arising out of the Nursing Home Reform Amendments, 42 U.S.C. § 1396r, various Medicaid provisions of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Named as defendants were the Governor of Massachusetts, the Commissioner of DMR, the Secretaries of the Massachusetts Executive Office of Administration and Finance and Executive Office of Health and Human Services, and the Commissioners of the Departments of Public Health, the Massachusetts Rehabilitation Commission and the Division of Medical Assistance ("DMA") (collectively "Defendants"). Plaintiffs' motion for class certification was approved, with certain modifications, on February 2, 1999, which the court thereafter refused to stay. (See Mem. and Order with Regard to Defs.' Mot. to Stay Class–Wide Disc. and Claims for Class–Wide Relief Pending Appeal (Docket No. 62).) Defendants' subsequent motion to dismiss was denied on June 4, 1999. *See Rolland v. Cellucci,* 52 F.Supp.2d 231 (D.Mass.1999).

The day before an evidentiary hearing was scheduled to begin with respect to Plaintiffs' motion for a preliminary injunction, a motion which focused on specialized services that Plaintiffs asserted were being denied the class, the parties reached an interim agreement. (See Agreement in Lieu of Prelim. Inj. Regarding Provision of Specialized Services ("Interim Agreement") (Docket No. 71).) That agreement, approved by the court on March 11, 1999, provided that all persons for whom specialized services had been recommended by Defendants' agent, Metro-West, would receive those services within the ensuing thirteen months. The matter was thereafter set for a full trial commencing November 1, 1999, on all issues regarding both specialized services and community placement.

After extensive discovery, which necessitated the court's intervention on occasion, Defendants filed a motion for summary judgment on September 22, 1999. Plaintiffs sought and obtained an extension to file their response and, thereafter, the parties engaged in extended settlement discussion with a jointly-selected mediator. The mediation process continued over the course of two weeks in October and, according to the parties, entailed seven lengthy sessions totaling more than fifty hours. At the end of the process, the parties entered into an agreement (hereinafter the "Settlement Agreement") which, the parties represent, addresses all issues raised by Plaintiffs in their amended complaint.

On October 26, 1999, the court approved the Settlement Agreement on a preliminary basis and required the parties to send a court-sanctioned notice to all class members by November 5, 1999. (See Prelim. Finding; Joint Notice Regarding Settlement ("Joint Notice") (Docket No. 121).) A fairness hearing was held on December 17, 1999, at which time the court heard from the parties' respective attorneys, two witnesses and, upon request, an attorney for a class of plain-

tiffs in a separate consolidated case, *Ricci v. Okin,* Civil Action Nos. 72–0469–T, 74–2768–T, 75–3910–T, 75–5023–T and 75–5210–T. The parties' presentations supplemented extensive memoranda. At the conclusion of the hearing, the court indicated that it intended to approve the Settlement Agreement. It now memorializes in detail its reasons for such approval.

## II. *PRESUMPTION OF REASONABLENESS*

■ The proponents of a class settlement can obtain "a strong initial presumption that the compromise is fair and reasonable" by establishing that the settlement was reached after arms-length negotiations, that the proponents' attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small. *Galdi Sec. Corp. v. Propp,* 87 F.R.D. 6, 9 (S.D.N.Y.1979). *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977); *Bussie v. Allmerica Fin. Corp.,* 50 F.Supp.2d 59, 77 (D.Mass.1999). The court must also establish that the parties validly consented, that reasonable notice was given, and that no term of the settlement violates federal law. *Durrett v. Hous. Auth. of City of Providence,* 896 F.2d 600, 604 (1st Cir. 1990).

■ This case warrants a strong initial presumption that the parties' compromise is fair and reasonable. The issues presented by the parties were vigorously contested before the court and the parties entered into mediated discussions only after the completion of extensive discovery. Moreover, there is no question that the settlement was reached after arms-length negotiations. Indeed, the court is given to understand that the parties were kept at significantly greater than arms length during the course of mediation.

Further, the discovery was more than sufficient to enable the parties' representatives to act intelligently. As part of the discovery, Plaintiffs propounded two sets of interrogatories to multiple state agencies, deposed twenty-one fact witnesses and one expert, obtained and reviewed thousands of pages of documents, and retained eight clinical and programmatic experts to evaluate Defendants' actions vis-a-vis class members. In addition, Plaintiffs' experts evaluated the services provided to a random sample of class members, reviewed nursing facility and DMR records, and considered service reports in order to determine whether class members needed and were receiving specialized services or community placement. Four of Plaintiffs' experts also toured nursing facilities to observe class members as well as community activities in which they participated. On the other side, Defendants propounded interrogatories and document requests, retained at least one expert, who issued a report, and deposed Plaintiffs' experts.

Moreover, there is little question that the parties' respective attorneys are well versed in the law and experienced in these matters. This is evident, if for no other reason, by the detail with which the Settlement Agreement addresses all the claims raised in the lawsuit. In fact, the court has already determined that Plaintiffs' attorneys' extensive experience, in appropriate part, merited certification of the class. (See Mem. and Order with Regard to Pls.' Mot. for Class Certification (Docket No. 48).)

Reasonable notice, with prior approval of the court, was also provided to class members. (See Joint Notice.) That notice, together with efforts on the part of at least one of the organizational plaintiffs, ARC, as described at the fairness hearing, ensured that class members, together with their families, guardians and advocates, were adequately informed of the terms of the Settlement Agreement.

In addition, no real opposition was expressed to the Settlement Agreement. The court received only one written comment which was generally favorable. (See Dorothy F. Diamond Letter dated Nov. 16, 1999 (Docket No. 129).) Plaintiffs themselves report that relatively few inquiries were made of their counsel in response to the court-ordered notice. (See Aff. of Att'y Matthew Engel ("Engel Aff.") (Docket No. 123).) Of the sixteen telephone calls received by No-

vember 30, 1999, and the handful of calls received thereafter, only three expressed any concern about the terms of the agreement. That concern invariably reflected a desire that wards or family members not be forced from nursing homes against their wills. In each instance, Plaintiffs report, their counsel explained that class members could choose to remain in a nursing home in the event that a community placement was offered. "This explanation of the informed consent provision of the agreement," Plaintiffs continue, "appeared to satisfy their concerns." (Engel Aff., ¶ 5.)

Finally, there is no question that the parties validly consented to the Settlement Agreement. Nor is there a claim that any of the terms of the Settlement Agreement violates federal law.

## III. *SETTLEMENT AGREEMENT*

The Settlement Agreement establishes a presumption in favor of community placement. (Settlement Agreement (Docket No. 115), ¶ 3.) The agreement makes clear that "[i]t is DMR's policy that its services and supports for nursing home class members should be appropriate to their needs and abilities, and that the provision of services in a community setting is desirable whenever it is appropriate for the individual's circumstances." (Id.) Accordingly, the Settlement Agreement commits DMR to resolve whether a community setting is appropriate for each class member and to offer such services "unless DMR, in its professional judgment, determines that the individual cannot 'handle and benefit from' a community residential setting." (Id. (quoting *Olmstead v. L.C., ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 2179, 144 L.Ed.2d 540 (1999)).) The exclusive factors which DMR can consider in rebutting this presumption include a consideration of the advantages of community living and the possible safety risks in transferring individuals to community settings. DMR's decisions are subject to appeal by class members and, under certain conditions, subject to review by an independent expert.

The Settlement Agreement also establishes a schedule of the number of individuals to be placed in community residences in fis-cal years 2000 through 2007. These numbers vary from 75 class members during fiscal year 2000, to 175 class members for each of fiscal years 2001 and 2002, and up to 150 class members in each of the ensuing five fiscal years. Only when Defendants have completed these placement requirements will they have no obligation under the Settlement Agreement to provide additional residential supports.

The Settlement Agreement also ensures that no class member will be involuntarily transferred from a nursing facility to the community. Thus, "Defendants are not required to provide residential and other supports to a person with mental retardation or other developmental disabilities if the person knowingly objects to the provision of such supports." (Settlement Agreement, ¶ 4(f).) The objection shall be honored, however, only after the person: "(1) has an opportunity to express his or her interests and preferences and any ties he or she might have to a particular community or locale; (2) has been informed of the residential supports in a manner that reflects the person's ability to understand and communicate information; and (3) is provided the opportunity to visit and observe similar community settings." (Id.) Even then, Defendants must re-offer the choice for a period of three years.

In addition, the Settlement Agreement includes a specific commitment to divert a total of 275 potential admissions to nursing homes over the next six years. Specifically, the agreement requires DMR to establish a diversion plan by March 1, 2000, designed to prevent all inappropriate and unnecessary admissions. The plan must include a process for agency review of all new admissions and a commitment to develop community services for persons who do not need to be in a nursing facility.

The Settlement Agreement also continues Defendants' obligations under the Interim Agreement on specialized services. All class members in need must be provided these services no later than April 30, 2000, or within ninety days of an individual's admission to a nursing facility. In addition, the parties have committed themselves to the employment of an independent expert who

will have broad authority to review individual placements and specialized service determinations, as well as the quality and adequacy of the placement process, if and when certain benchmarks are not achieved. Specifically, the independent expert's authority to review such determinations is triggered if the rate of community placement or specialized service recommendations falls below 75% of the individuals reviewed in a particular quarter. While the expert does not have the authority to reverse determinations, she can make recommendations which Defendants must consider in good faith.

Moreover, the parties' agreement recognizes that non-Medicaid funded services are subject to appropriation by the Massachusetts legislature, although there is a requirement that Defendants make full funding of the Settlement Agreement a priority in all budget requests and negotiations. Medicaid-funded services, on the other hand, must be provided if there are mandatory obligations under the state's Medicaid plan. To the extent that sufficient funding is not appropriated in a particular year to allow Defendants to implement the requirements of the schedule, those obligations are carried forward into the future. Thus, the Settlement Agreement requires good faith efforts to obtain the necessary funding and, ultimately, the accomplishment of the placement obligations when funding is obtained.

Further, the Settlement Agreement includes a number of implementation provisions designed to ensure accountability on the part of relevant state agencies. First, funding must be transferred from DMA to DMR each year as class members leave nursing facilities. Second, DMR will be responsible for providing or arranging specialized services as residential supports for class members with other developmental disabilities, as well as for those with mental retardation. Third, a waiver program will be expanded to include individuals with other developmental disabilities. Fourth, a reporting process will be established to assure that Plaintiffs are informed on a regular basis of Defendants' activities in implementing their obligations under the agreement.

An enforcement scheme is also incorporated into the Settlement Agreement. Although the parties acknowledge that the agreement, once approved, will become an order of the court, they also recognize that it cannot be enforced directly by contempt or specific performance. Instead, Plaintiffs must first prove noncompliance with its provisions. Once proven, the court may enter further remedial relief, which itself would be subject to contempt or other enforcement remedies. Prior to any judicial involvement, however, the parties must attempt to resolve their disputes informally and, then, through mediation.

As a last matter, the Settlement Agreement recognizes that Plaintiffs are the prevailing parties in the litigation and, as such, are entitled to attorneys' fees. The calculation of such fees, together with possible court involvement, is reserved for another day.

## IV. FAIRNESS DETERMINATION

■ Beyond applying the strong presumption in favor of the Settlement Agreement, the court has considered a panoply of factors in determining whether the agreement is fair, adequate and reasonable under the circumstances. "Th[e] fairness determination is not based on a single inflexible litmus test but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Bussie,* 50 F.Supp.2d at 72. *See also M. Berenson, Co. v. Faneuil Hall Marketplace, Inc.,* 671 F.Supp. 819, 822–23 (D.Mass.1987); *Duhaime,* 177 F.R.D. at 68 (citing *Santana v. Collazo,* 714 F.2d 1172, 1175 (1st Cir.1983)). Among these factors are: (1) Plaintiffs' likelihood of success on the merits; (2) the amount and nature of discovery or evidence; (3) the actual settlement terms and conditions; (4) the recommendation and experience of counsel; (5) the future expense and likely duration of litigation; (6) the recommendation of neutral parties, if any; (7) the number and nature of objections; and (8) the presence of good faith and the absence of collusion. *See Giusti–Bravo v. U.S. Veterans Admin.,* 853 F.Supp. 34, 36 (D.P.R.1993). *See also Durrett,* 896

F.2d at 604. To these, the court has added the possible effect on the interests of third parties.

### 1. *Likelihood of Success*

As an initial matter, the court is required to judge the reasonableness of the proposed settlement by evaluating the probable outcome of the litigation and weighing the remedies the class could secure from the settlement against the probable cost of continued litigation. *Giusti–Bravo*, 853 F.Supp. at 36 (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981)). *See also Duhaime*, 177 F.R.D. at 68 (*citing Santana*, 714 F.2d at 1175).

If nothing else, the court's decision denying Defendants' motion to dismiss suggests the strength of Plaintiffs' claims and the likelihood that the class was heading towards some relief. First, the court found that the Nursing Home Reform Amendments were enforceable by Plaintiffs and that the implementing regulations were sufficiently clear as to create an obligation to provide specialized services to residents of nursing facilities. *Rolland*, 52 F.Supp.2d at 235–36. *See also Martin v. Voinovich*, 840 F.Supp. 1175, 1202 (S.D.Ohio 1993). In the court's view, the Interim Agreement recognized that supportive services within nursing homes needed to be provided to class members as soon as possible.

Second, the court found viable each of Plaintiffs' Medicaid claims. The court determined that the reasonable promptness provisions of the Medicaid program, set forth at 42 U.S.C. § 1396a(a)(8), were mandatory and enforceable, entitling class members to medically necessary services in a reasonably timely manner. *Rolland*, 52 F.Supp.2d at 239–40. Similarly, the court found that statutory comparability provisions, located at 42 U.S.C. § 1396a(a)(10)(B), were enforceable and required that similarly needy persons be provided access to comparable services. *Id.* at 239. *See also Parry v. Crawford*, 990 F.Supp. 1250, 1257 (D.Nev.1998); *White v. Beal*, 555 F.2d 1146, 1151–52 (3rd Cir.1977). The court also determined that the freedom of choice provisions, *see* 42 U.S.C. § 1396n(c)(2)(C), afforded class members a choice among feasible Medicaid services. *Rolland*, 52 F.Supp.2d at 240–41.

Third, and perhaps most importantly, the court found that the integration mandate of the ADA was enforceable and created an obligation on public entities to provide community services to certain institutionalized individuals. *Id.* at 236–37. Soon after that finding, the Supreme Court held that the ADA in fact prohibits segregation of persons with disabilities and requires states to make reasonable efforts to place institutionalized individuals with disabilities into the community. *Olmstead*, 119 S.Ct. at 2185–86. In particular, the Supreme Court found a qualified right to community placement for two patients who had been confined for treatment to a state mental hospital when the state's treatment professionals determined that community placement was appropriate and the patients did not oppose the transfer from institutional care to a less restrictive setting. Such placement, the Supreme Court indicated, "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 2181. More specifically, the Supreme Court held that, where state treatment professionals determine that community placement is appropriate—when transfer to the most integrated setting is not opposed by the affected individual, and when placement can be fairly and reasonably accommodated in the state's overall budgetary scheme—the refusal to fund and provide community placement violates the ADA's anti-discrimination provisions. *Id.*

Granted, this court's ruling arose in the context of Defendants' motion to dismiss. Still, it presaged likely success on Plaintiffs' part. Nevertheless, Plaintiffs recognize that the precise scope of that success would be difficult to predict, particularly given the complicated statutory scheme around which they wove their claims. *See Bussie*, 50 F.Supp.2d at 76. It is somewhat doubtful that Plaintiffs could have obtained relief at trial in the comprehensive and detailed manner with which relief is afforded them in the Settlement Agreement.

### 2. Amount and Nature of Discovery and Evidence

The court is required to ascertain whether sufficient evidence has been obtained through discovery to determine the adequacy of the settlement. *Giusti–Bravo*, 853 F.Supp. at 38. In addition, " '[t]he stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of Plaintiffs' claims.' " *Duhaime*, 177 F.R.D. at 67 (quoting *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980)).

Here, as in *Bussie*, 50 F.Supp.2d at 72, the parties' discovery efforts have enabled the attorneys to assess the merits of the action and negotiate a principled compromise. Virtually all discovery was complete at the time the parties commenced mediation. Not only did the parties have a voluminous amount of information at that time, they had the advice and reports of their respective experts. Thus, the parties' agreement was achieved precisely at the moment when they were most informed and, concomitantly, most at risk given the impending trial.

### 3. Recommendations and Experience of Counsel

■ When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight. *Bussie*, 50 F.Supp.2d at 72. That holds true here. Plaintiffs' attorneys in particular, upon whom the burden of demonstrating fairness to the class most heavily falls, have a significant background in disability law. Three of the attorneys have extensive experience in litigating, negotiating and implementing structural reforms on behalf of individuals with disabilities in institutional settings. Another of the Plaintiffs' counsel is an experienced attorney with a private firm who has litigated several class action cases. Moreover, all the attorneys report that they participated in the drafting of the proposed agreement, debated its terms at length, consulted with class representatives and unanimously recommended approval.

### 4. Future Expense and Likely Duration of Settlement

When comparing "the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation," *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D.Colo.1974), there are clearly strong arguments for approving a settlement. *See Giusti–Bravo*, 853 F.Supp. at 40; *Galdi Sec. Corp.*, 87 F.R.D. at 9. Here, the court had scheduled at least two weeks for trial. A proceeding of such magnitude would have imposed significant preparatory time on everyone and would likely have required the court several months to issue an opinion. In addition, there may well have been an appeal stretching over a year or two. All parties properly recognized that, without a settlement, this expenditure of resources would have been considerable.

### 5. Recommendation of Neutral Parties, If Any

The court has not received any recommendation regarding the Settlement Agreement from neutral third parties. However, the court has considered the views of Dr. K. Charles Lakin, one of Plaintiffs' experts, and Leo Sarkissian, executive director of ARC, both of whom testified at the fairness hearing. (See Plaintiffs' Exh. 1.)

Dr. Lakin, a prominent national researcher in the field of mental retardation and developmental disability, testified that the provisions of the Settlement Agreement, in particular those provisions dealing with specialized services and community residential supports, were fair and adequate. While he expressed a preference for a somewhat quicker implementation of community placement, he opined that the terms of the agreement were, at bottom, reasonable. Similarly, Mr. Sarkissian supported the reasonableness of the Settlement Agreement. Although he expressed some concerns with respect to both the diversion plan and its funding, he indicated that DMR, in particular, had the expertise

for and the commitment to full implementation of the entire Settlement Agreement.

### 6. *Number of Objectors and Nature of Objections*

As described, there have been no formal objections to the substantive provisions of the Settlement Agreement. *See Bussie*, 50 F.Supp.2d at 72 (noting that favorable reaction of class to settlement, albeit not dispositive, constitutes strong evidence of fairness of proposed settlement) (*citing In re Painewebber Limited Partnerships Litigation*, 171 F.R.D. 104, 106 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir.1997)). *See also Duhaime*, 177 F.R.D. at 70; *Giusti–Bravo*, 853 F.Supp. at 40. Of the handful of inquiries received by Plaintiffs' counsel, only three or four expressed any concern about its terms, concerns invariably centered on the misperceived possibility of forced removal of class members from nursing homes. As described, such concerns quickly were allayed.

### 7. *The Presence of Good Faith and the Absence of Collusion*

The parties attempted to settle their differences for over seven months prior to Plaintiffs filing their complaint. After suit was initiated, Plaintiffs sent a number of settlement proposals to Defendants. In addition, the court, throughout the litigation, has encouraged the parties to attempt to settle the case. Only when discovery was complete were intensive arms-length settlement negotiations conducted, an approach which supports the "strong initial presumption" of the settlement's substantive fairness. *Bussie*, 50 F.Supp.2d at 77.

Clearly, the case has been aggressively litigated. Indeed, only at the end of discovery did the parties engage in a seven day, fifty-five hour mediation marathon. At bottom, there is every indication that the parties reached their agreement in good faith and in the absence of collusion.

### 8. *Settlement Terms and Conditions*

As described above, the Settlement Agreement is comprehensive and secures significant relief for class members. Most importantly, as the parties' respective submissions and testimony adduced at the fairness hearing demonstrate, the Settlement Agreement reflects a professional consensus that it is reasonable. Granted, Plaintiffs believe that more or quicker reforms may have been desirable. Nevertheless, they recognize that the Settlement Agreement "strikes a reasonable balance between the interests of all parties and affords plaintiff classmembers a substantial probability of receiving the specialized and community services which they need." (Pls.' Mem. in Supp. of Approval of Settlement Agreement ("Pls.' Mem.") (Docket No. 126) at 33.)

In reaching this conclusion, Plaintiffs have come to terms with three issues in particular. First, the community placement schedule, although more ambitious than Defendants' prior plans, is somewhat slower than that recommended by Plaintiffs' experts. Still, Plaintiffs concede that the schedule is reasonable in light of the tasks necessary to ensure quality placement for all class members. Plaintiffs report that the number of placements required should be adequate to serve all class members who are appropriate for community living. Moreover, Plaintiffs state, the funds identified in the Settlement Agreement should allow DMR to develop residential and other supports appropriate to the needs of all class members, including those with challenging medical conditions.

Second, Plaintiffs were concerned about DMR's ability to modify the diversion plan at any time free from independent enforcement of the overall agreement. Diversion, Dr. Lakin testified, is the key to deinstitutionalization. (Tr. of Fairness Hr'g (Docket No. 134) at 51–52.) Dr. Lakin described how diversion of admissions to nursing facilities could ensure that nursing homes would be depopulated, as called for by the Settlement Agreement, and not inadvertently repopulated through the back door. Dr. Lakin opined and his report revealed that only the full implementation of a diversion plan could accomplish the goal of reducing the nursing home population of mentally retarded and other developmentally disabled individuals.

Despite Plaintiffs' concerns, they reported at the fairness hearing that they are san-

guine about the ability of the diversion plan to achieve their objectives and to cause, or assist in causing, a dramatic reduction in admissions. The alternative, Plaintiffs report, is that Defendants would be required to provide specialized services to a new and growing population of individuals with mental retardation or other developmental disabilities within the nursing home context, an expensive prospect.

Third, and perhaps more problematically, Plaintiffs are concerned that the Settlement Agreement lacks "a clear requirement that classmembers must be placed in *small and home-like,* integrated communities settings." (Pls.' Mem. at 27 (emphasis in original).) "While community residences are subject to limitations set forth in DMR's regulations, which currently restrict all new programs to four persons or less," Plaintiffs state, "DMR retains the discretion to modify these regulations in its professional judgment." (Id.) This concern has been heightened by what Plaintiffs believe to be Defendants' consideration of a possible amendment to DMR regulations that would allow class members to be placed in residential settings which serve up to sixteen persons. "There is a professional consensus throughout the Nation," Plaintiffs assert, "as evidenced by other states' regulations and court orders, that living arrangements larger than four, or perhaps six at the most, are inconsistent with the current standards of practice and limit the individual's ability to develop and grow." (Id.) In his testimony at the fairness hearing, Dr. Lakin referred to smaller capacity residences as "culturally typical housing." (Tr. of Fairness Hr'g at 50–51.)

Defendants mount a two-part response to Plaintiffs' concern about the size of community residences. First, Defendants question whether Plaintiffs' qualms ought to be called to the court's attention in the context of the fairness hearing. "The function of a fairness hearing," Defendants' counsel wrote to Plaintiffs' counsel in early December, " 'is not to reopen and enter into negotiations with the litigants in their hope of improving the terms of the settlement.' " (Defs.' Ex. 1 of Fairness Hr'g (quoting *Steinberg v. Carey,* 470 F.Supp. 471, 474 (S.D.N.Y.1979)).) Second, in the same letter, Defendants' counsel seeks to allay Plaintiffs' particular concerns:

> As I indicated in the telephone conversation prior to November 30, I have communicated to DMR your concerns as to possible changes in the regulations, as well as your preference that group homes be limited to seven or eight persons, and DMR will consider your views if and when it decides to amend the regulations. In addition, I am informed that the rumors conveyed to you by "a number of knowledgeable sources" is [sic] incorrect, in that DMR does not presently intend to amend its regulations to permit up to sixteen persons to live in group homes.

(Id.)

As to Defendants' first response, the court believes that it is appropriate, if not incumbent upon Plaintiffs, to disclose any facet of the Settlement Agreement that may adversely affect members of the class. While Plaintiffs' particular concerns with the size of community residences may go somewhat beyond that standard, the court nonetheless appreciates Plaintiffs' calling the matter to the court's attention. As the court indicated at the conclusion of the fairness hearing, however, it cannot alter the terms of the Settlement Agreement; if anything, the court's discretion "is restrained by the clear policy in favor of encouraging settlements." *Durrett,* 896 F.2d at 604 (quotation marks and citation omitted). Still, the court must ensure that there has in fact been a meeting of the minds among the parties so that the future viability of the Settlement Agreement itself cannot be undermined.

The court is satisfied that, as the parties themselves represented, there has been a meeting of the minds. The parties specifically agreed that DMR reserved to itself the right to amend its regulations. Thus, even were the court to have some concern about the size of community residences, that concern likely "would exist, and maybe even be enlarged, at the end of successful litigation of either numerous individual actions or of [this] class action." *In re First Commodity Corp. of Boston Customer Accounts Litig.,* 119 F.R.D. 301, 314 (D.Mass.1987).

As to Defendants' second response, their effort to allay Plaintiffs' concerns is well advised. The number of residents that will live in each community setting must be consistent with existing DMR regulations. (Settlement Agreement, ¶ 4(e).) As acknowledged at the fairness hearing, however, the Settlement Agreement subsumes a procedural mechanism by which DMR regulations may be amended. Still, the Settlement Agreement itself may limit DMR's ability to exceed certain sizes of group homes established or made available thereunder. "In implementing the provision of residential supports," the Settlement Agreement states, "DMR will utilize internal and external professional expertise as it deems appropriate." In the court's view, DMR may be hard pressed to expand the numbers allowable in group homes in the future when to date its professional judgment, together with the evident professional judgment of others, is that grouphome limits of four—and, with certain exceptions, seven or eight—are appropriate.

### 9. Rights of Third Parties

The final factor which the court has considered is the possible effect of the Settlement Agreement on third parties. Although the litigants did not directly raise this factor in their respective memoranda, case law supports analyzing a settlement as it may pertain to third parties. *See In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1026 (2nd Cir.1992) (citing cases). *See also Durrett*, 896 F.2d at 604 (court must assure that, "if third parties will be affected," the agreement "will not be unreasonable or legally impermissible as to them"); *United States v. City of Miami, Fla.*, 664 F.2d 435, 441 (5th Cir.1981) ("If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.") (Rubin, J., concurring). At least two third-party matters have come to the court's attention, both of which involve other class actions.

#### a. Ricci v. Okin

On December 16, 1999, the court received a letter from Ms. Janet Viggiani, counsel for the plaintiffs in *Ricci v. Okin*, District Judge Joseph L. Tauro's seminal case concerning residents of the Belchertown State School. Ms. Viggiani's letter raised concerns about the final paragraph in the Settlement Agreement which, in its entirety, states that "[n]othing in this Agreement is intended to affect any rights of any party or non-party, other than those rights specifically addressed herein." (Settlement Agreement, ¶ 44.) Ms. Viggiani claimed in her letter that this provision was ambiguous and did not clearly protect the rights of the *Ricci* plaintiffs as set forth in Judge Tauro's Final Order. Accordingly, Ms. Viggiani proposed language to the court, which she previously offered to the parties, that would make specific reference to Judge Tauro's Final Order.

Maureen S. Tracy, another attorney for the *Ricci* class, addressed the issue at the fairness hearing. The court welcomed the opportunity to have the issue clarified. Ms. Tracy stated on behalf of the *Ricci* plaintiffs that she did not want to undermine the substance of the Settlement Agreement itself. Rather, out of an abundance of caution, she simply wished to assure that *Ricci* class members experienced no adverse effects therefrom.

The court believes that the Settlement Agreement has no adverse effect on the *Ricci* class. First, the Settlement Agreement does not, directly or indirectly, affect the rights of that class or the terms of the final order entered in that case. Second, as the *Ricci* plaintiffs must perforce acknowledge, any and all existing benefits claimed by them would assumedly remain enforceable in that case. Finally, the addition of the language proposed by Ms. Tracy and Ms. Viggiani might actually render the plain language of the Settlement Agreement *more* ambiguous, by suggesting that it could affect the terms of orders other than the final order entered in *Ricci*. At bottom, the court finds that the Settlement Agreement avoids any adverse consequence to any member of the *Ricci* class and, therefore, its language should remain unaltered.

#### b. Anderson v. Cellucci

At the fairness hearing, the court inquired of counsel about the putative class in

*Anderson v. Cellucci,* Civil Action No. 99–10617–DPW, a case pending before District Judge Douglas P. Woodlock. The class which the plaintiffs seek to have certified in *Anderson* is comprised of mentally retarded individuals who live with their families, as distinct from members of the instant class who reside in nursing homes.

Defendants made mention of the *Anderson* litigation in their memorandum. Defendants indicated that DMR, in distributing any funding available for residential community placements, must set priorities among several groups of consumers, including the *Ricci* class members, mentally retarded individuals who lose their special education in benefits upon turning the age of twenty-two, the putative class in *Anderson,* the instant class of residents of nursing facilities and, finally, "consumers whose needs or circumstances have undergone significant changes, making more intensive supports necessary." (Defs.' Mem. Regarding the Proposed Settlement (Docket No. 122) at 6.) "In *Anderson,*" Defendants explained, "the plaintiffs seek an order requiring that DMR provide services in group homes for thousands of mentally retarded individuals who are living with their families. If issued, such an order would require substantial new funding." (Id.)

*Anderson* having been called to its attention, the court reviewed the two most recent filings therein, one a letter to Judge Woodlock informing him of the agreement in the present lawsuit and, second, the *Anderson* plaintiffs' counsel's response. In the first letter, Defendants' counsel, a lawyer with the Massachusetts Attorney General's Office, the office that represents Defendants here, provided a copy of the present settlement documents to Judge Woodlock and explained that the present agreement "may indirectly affect the plaintiffs in [the *Anderson* ] case." (Ct. Ex. 1 of Fairness Hr'g.) Upon inquiry, Defendants' counsel informed the court at the fairness hearing that, despite the language in

the letter to Judge Woodlock, the present settlement has no bearing on *Anderson.*

The *Anderson* plaintiffs' counsel, Neil V. McKittrick, appears to agree. In Mr. McKittrick's responsive letter to Judge Woodlock, he distinguishes the two classes and states that, "[c]ontrary to defense counsel's suggestion, the settlement in *Rolland* has no bearing on the Plaintiffs' claims or their motion for summary judgment, which is currently pending in [the *Anderson* ] case." (Ct.Ex. 2 of Fairness Hr'g.) While Mr. McKittrick takes the Attorney General's Office to task on other matters, he acknowledges that the *Anderson* plaintiffs are *not* members of the *Rolland* class. Moreover, Mr. McKittrick indicates that his review of the Settlement Agreement

> reveals that it offers nothing for the named plaintiffs in [the *Anderson* ] case. None of the named plaintiffs in [the *Anderson* ] case is a nursing home resident. Nothing in the settlement agreement requires, or even suggests, that DMR will soon undertake to provide 24–hour residential services for adults with mental retardation or developmental disabilities who presently live in their parents' homes.

(Id.) The court agrees.[1]

Upon review and inquiry of the parties' respective attorneys in the present matter, the court finds that the interests of third parties are not at stake in any adverse manner with respect to the present agreement. Accordingly, the Settlement Agreement has earned the court's stamp of approval.

### 10. *Final Analysis*

The court wishes to make four additional points with the regard to the Settlement Agreement as a whole. First, "[i]n evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff[s] after full and

---

1. After the fairness hearing, Defendants filed a copy of yet another letter written to Judge Woodlock by the Attorney General's Office. In that letter, Defendants respond to Mr. McKittrick's letter and explain that they provided Judge Woodlock with the *Rolland* documents because they deemed it "appropriate to ensure that the Court and opposing counsel were aware of a significant development in the *Rolland* case, which seeks similar relief against the Department of Mental Retardation." (Peter T. Wechsler Ltr. dated December 22, 1999 (labelled Defs.' Ex. 2 of Fairness Hr'g).)

successful litigation of the claim[s]." *Duhaime*, 177 F.R.D. at 68. Thus, Plaintiffs' recognition that the Settlement Agreement is fair and reasonable, even though it may fall short of higher goals they set, is persuasive.

Second, the court has evaluated the Settlement Agreement in light of the Supreme Court's recent pronouncements in *Olmstead* and has found it reasonable and balanced. In determining whether a state's plan to place institutionalized individuals with disabilities into the community is "reasonable," a court must consider not only the impact on the state's budget of providing the services in question, but also the competing demands of the state's available resources. *Id.*, 119 S.Ct. at 2188–89. *See also Rolland*, 52 F.Supp.2d at 237 ("In the present matter and at this phase in the litigation, the court cannot find as a matter of law that Plaintiffs have requested services that would require a fundamental alteration to the system."). Here, Plaintiffs' recognition of the financial limits of their quest, combined with DMR's discretionary authority, reflects a wise and fundamental understanding on their part that the ideal solution which they desired might well have been beyond their reach were the matter to have gone to trial. *See Dimarzo v. Cahill*, 575 F.2d 15, 19 (1st Cir.1978).

Third, the court is particularly impressed with that part of the Settlement Agreement which coordinates the efforts of state agencies and places final responsibility with DMR. The court recalls Plaintiffs' initial concern that, given the ongoing lack of coordination—if not conflict—between DMR and the DMA, many individuals were "falling between the cracks." Now, this "forgotten generation of people," as Dr. Lakin described the class, has been made significantly more visible in the eyes of the Commonwealth. In this vein, Defendants reported at the fairness hearing that DMR will appoint a senior staff person to coordinate its various endeavors.

Finally, and perhaps most importantly, the immediate provision of all services due class members in nursing facilities, together with placement opportunities in the community, expands the horizons of mentally retarded and developmentally disabled individuals now confined to those facilities. The proof, of course, will be in the pudding: a comprehensive diversion plan which ensures the reduction of the population of the class in nursing homes, full and ongoing funding by the state legislature, the establishment of community residences professionally-sized and staffed for which class members will have an informed choice, an ongoing commitment by Defendants to the terms and spirit of the Settlement Agreement, and careful monitoring by Plaintiffs.

Dr. Lakin's testimony at the fairness hearing in this regard is well taken. As to services, Dr. Lakin testified that since "the ultimate goal[ ] of specialized services [is] to develop people's human potential, the most predictable way of accomplishing that is to give people an opportunity to live a life that is typical of the way humans live in our society." (Tr. of Fairness Hr'g at 45). As to community placement, Dr. Lakin testified that he was "enthusiastic about" the fact "that a lot of people are going to get out of those nursing homes because as important as it is that people get the specialized services they're entitled to," he believed that "we've come to recognize that treatment within an institution is not as effective in achieving one's human growth potential [as] the opportunity to live culturally typical lives." (Tr. of Fairness Hr'g at 44).

In sum, the court believes that the Settlement Agreement, while not everything that Plaintiffs or Defendants for that matter, might have wished, is fair, adequate and reasonable under all the circumstances. As Plaintiffs acknowledge, the agreement "represents a reasonable balance between the interest of class members, the prerogatives of the Legislature, and the authority of federal courts to mandate compliance with substantive provisions of its orders." (Pls.' Mem. at 30.)

## V. CONCLUSION

Having considered all appropriate factors, the court finds, pursuant to FED.R.CIV.P. 23(e), that the parties' Settlement Agreement is fair, adequate and reasonable. A separate order shall issue. The court will retain jurisdiction in accord with the terms of the Settle-

ment Agreement in order to entertain any allegations that any of its provisions has been violated. Barring further developments, the court intends to administratively close this case on July 1, 2000, *see Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 392 n. 2 (1st Cir.1999), and to dismiss it in its entirety on July 1, 2010.