Loretta ROLLAND, et al., Plaintiffs

v.

Deval PATRICK, et al., Defendants.

Civil Action No. 98–30208–KPN.

United States District Court,
D. Massachusetts.

May 23, 2013.

Cathy E. Costanzo, Steven J. Schwartz, Center for Public Representation, Matthew Engel, Disability Law Center, Inc., Northampton, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Jeffrey S. Follett, Foley Hoag LLP, Boston, MA, Stephen M. Sheehy, Stephen M. Sheehy, P.C., Waltham, MA, for Plaintiffs.

David A. Guberman, Kenneth W. Salinger, Office of the Attorney General, Boston, MA, for Defendants.

*FINAL MEMORANDUM AND ORDER*

NEIMAN, United States Magistrate Judge.

There may have been some question in this class action lawsuit about the need for a final hearing on May 8, 2013, given the parties' agreement that the case had run its course and should be dismissed. But as in our personal lives—with births, significant events and deaths—this case too deserved a rite of passage, to mark the

occasion, explore lessons learned, and look to the future. Hence the hearing, hence this final memorandum and order.

### THE CONSENT DECREE

 As the parties know, "[a] consent decree is a negotiated agreement that is entered as a judgment of the court." *Johnson v. Lodge # 93 of Fraternal Order of Police*, 393 F.3d 1096, 1101 (10th Cir. 2004). " 'Consent decrees, therefore, have characteristics both of contracts and of final judgments on the merits.' " *Id.* (quoting *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193 (10th Cir.1993)). Thus, it is more than just a voluntary agreement; it is also a final order that "places the power and prestige of the court behind the compromise struck by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

Here, the parties' agreement required the expiration of the decree if certain benchmarks were reached. In particular, Paragraph 50 of the Settlement Agreement on Active Treatment—the superseding agreement entered by the parties in March of 2008 and approved by the court on June 16, 2008 (hereinafter the "Second Settlement Agreement")—provided as follows: "[i]f the court determines that 640 class members have been transitioned from nursing facilities to the community, with appropriate supports, and that the [Court] Monitor's individual recommendations for active treatment have been implemented, this case shall be dismissed." The latter of these two requirements was limited by Paragraph 33 of the agreement to those class members who were not recommended for community placement.

To the uninitiated, of course, these paragraphs may appear somewhat opaque, making reference as they do to "class members," "transition[s]" from "nursing facilities," "community placement," "Moni-

tor," and "active treatment." And therein lies the tale of this litigation.

### HISTORY OF THE LITIGATION

On October 28, 1998, seven named plaintiffs filed a complaint on behalf of themselves and more than 1600 nursing residents in Massachusetts with intellectual and other developmental disabilities ("I/DD"), challenging what they claimed was their unnecessary confinement and segregation in nursing facilities, as well as the lack of federally-mandated specialized services in those facilities. The complaint, as amended, alleged that Defendants were violating several federal statutes, including the Nursing Home Reform Amendments ("NHRA") to the Medicaid Act, 42 U.S.C. § 1396r(e)(7) and its implementing regulations, 42 C.F.R. § 483.100 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and other provisions of the Medicaid Act, such as reasonable promptness, 42 U.S.C. § 1396a(a)(8), comparability, § 1396a(a)(10)(B)(i), freedom of choice, § 1396n(c)(2)(C), and Intermediate Care Facilities for the Mentally Retarded ("ICF/MR"), § 1396d(d).

The court certified the class, reconfigured at its request, over the objections of Defendants, who argued that their opposition cut across all elements of Fed.R.Civ.P. 23(a). *See Rolland v. Cellucci*, 1999 WL 34815562 (D.Mass. Feb. 2, 1999). Among other things, the court found that "the representative class members present substantially similar factual situations giving rise to common legal issues. The fact that individual class members may have somewhat different needs, or may have entered the nursing homes through different processes, or may be entitled to or need different services," the court continued, "does not justify denying class certification." *Id.* at *7.

Soon thereafter, Defendants sought to dismiss the action. Prior to ruling on that

motion, however, and a day before a scheduled hearing in March of 1999 on Plaintiffs' motion for a preliminary injunction focused on "specialized services," the parties entered into a provisional agreement, soon approved by the court, requiring Defendants to provide such services to class members. Thereafter, on June 4, 1999, the court denied Defendants' motion to dismiss. Although the parties agreed that the NHRA was enacted to quell overutilization of nursing home care for those not in need of institutionalization, the court found it necessary to address, and ultimately reject, Defendants' argument that the NHRA and its implementing regulations were unenforceable. *See Rolland v. Cellucci,* 52 F.Supp.2d 231, 234–36 (D.Mass.1999).

In a similar fashion—namely, on the eve of a hearing in October of 1999 on Plaintiffs' motion for a preliminary injunction focused on "community placement"—the parties, after extensive discovery, negotiation and mediation, entered into a more comprehensive settlement (the "First Settlement Agreement"). This agreement incorporated the interim March 1999 agreement and required as well that Defendants (a) provide specialized services in the form of "active treatment" to all class members on an accelerated timetable, (b) create a "diversion" program to prevent unnecessary nursing facility admissions, and (c) establish a "community placement" schedule to move more than 1100 class members out of nursing facilities and into community residences over a seven-year period from 2000 to 2007. In addition, the parties agreed that an independent expert was to monitor Defendants' progress and compliance.

Following a fairness hearing, the court approved the First Settlement Agreement and entered it as its own order on January 10, 2000. *See Rolland v. Cellucci,* 191 F.R.D. 3 (D.Mass.2000). In doing so, however, the court recognized certain inherent limitations to the settlement, including the speed of implementation and uncertain funding. Nonetheless, the court found the parties' agreement reasonable and balanced in light of the Supreme Court's recent pronouncements in *Olmstead v. L.C., ex rel. Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), that community placement was mandated by the ADA subject to available state resources. In particular, the court was impressed with that part of the First Settlement Agreement which would coordinate the efforts of state agencies and thereby avoid having a "forgotten generation of people" fall through the cracks. *Rolland,* 191 F.R.D. at 15. As for community residences, the court cited the testimony of Dr. K. Charles Lakin, one of Plaintiffs' experts, who was heartened by the fact "that a lot of people are going to get out of those nursing homes because as important as it is that people get specialized services they're entitled to," he believed that "we've come to recognize that treatment within an institution is not as effective in achieving one's human growth potential [as] the opportunity to live culturally typical lives." *Id.*

Unfortunately, within six months of the court's approval, the First Settlement Agreement started to unravel. Plaintiffs filed a noncompliance motion, after which the court on March 27, 2001, found that Defendants were not fulfilling their specialized services obligations. *See Rolland v. Cellucci,* 138 F.Supp.2d 110 (D.Mass. 2001). The court stressed at the time that "it is the [Commonwealth] which must ensure that specialized services meet active treatment standards" and highlighted the urgency for those standards to be achieved:

At bottom, Defendants must ensure that Plaintiffs do not fall into the cracks be-

tween state-offered services and private nursing facilities. "Active treatment" is not merely aspirational. It means the same things for residents of nursing facilities as it does for residents of institutional or community programs. That is the intent of federal law and, by incorporation, the Settlement Agreement. That is particularly important given the fact that, by operation of the agreement, many class members who are nursing home residents will not be placed into community residences for several years to come.

*Id.* at 117.

After Plaintiffs sought further relief and a four-day trial, the court on May 2, 2002, found that Defendants had violated the First Settlement Agreement and ordered them to develop and implement a more comprehensive policy on active treatment, as required not only by the NHRA but by the terms of the First Settlement Agreement itself. *See Rolland v. Cellucci,* 198 F.Supp.2d 25, 32 (D.Mass.2002). Defendants appealed this ruling, claiming that the court had misconstrued the NHRA, but on January 28, 2003, the First Circuit Court of Appeals affirmed. *See Rolland v. Romney,* 318 F.3d 42 (1st Cir.2003).

The following Spring, Plaintiffs again brought the issue of compliance to the court's attention. Although the court denied Plaintiffs' motion for contempt, it warned Defendants that sanctions would be imposed if they failed to provide service plans and active treatment to every class member who needed specialized services by December 30, 2003, and "not one day later." *See Rolland v. Romney,* 273 F.Supp.2d 140, 144 (D.Mass.2003). The court ascribed much of the delay to Defendants' "historic resistance to the concept of active treatment." *Id.* at 143.

In sharp contrast, Defendants' implementation of their community placement obligations was far more successful. Over the course of the seven years covered by the First Settlement Agreement (2000–2007), about 1150 class members moved from nursing facilities to community homes. Defendants also implemented a diversion policy which was generally successful at preventing at least some inappropriate and unnecessary nursing facility admissions of persons with I/DD.

Unfortunately, problems with the provision of active treatment persisted and on April 10, 2007, the court issued a more expansive order. *See Rolland v. Patrick,* 483 F.Supp.2d 107 (D.Mass.2007). The court acknowledged that Defendants had made some progress, for example, in implementing "carryover" services from nursing facilities to off-site day habilitation programs, but added that, "[n]onetheless, it is clear that the problems facing the class, which were meant to be addressed by the [First] Settlement Agreement and the court's subsequent orders, remain to be resolved fully, effectively and finally." *Id.* at 118. The court therefore ordered Defendants to revise the active treatment measuring device and to implement treatment which mirrored the active treatment guidelines in ICF/MRs. In addition, the court established the position of a Court Monitor to assess about 800 class members who remained in nursing facilities and to otherwise oversee Defendants' compliance. Two months later, on June 13, 2007, the court appointed Lyn Rucker to the position and, shortly thereafter, resolved the parties' countervailing proposals for a revised active treatment protocol. *See Rolland v. Patrick,* 2007 WL 7607256 (D.Mass. Aug. 2, 2007).

Ms. Rucker's first review of 35 class members, conducted from August to December of 2007, was, in her words, "an uncomfortable starting point." (Court Monitor's Rolland Active Treatment Re-

view Report, January 24, 2008, (Doc. No. 467) at 1.) Nearly all the individuals reviewed were not receiving active treatment. Still, Ms. Rucker noted a new commitment on Defendants' part to improve services for class members and, with that in mind, the parties convened a series of meetings to discuss the provision of active treatment to the 750 or so class members still scattered in nursing facilities across the Commonwealth. The parties soon acknowledged, however, that achieving compliance with relevant federal standards at those facilities, as ordered by the court, would involve tremendous energy, time, resources, and clinical capacity, forcing class members to continue to wait years for such services. As a result, the parties explored a different approach, namely, expanding community options for at least 640 class members over four years, providing enhanced services to class members awaiting placement, and implementing active treatment consistent with the court's orders to those fewer individuals unlikely to leave nursing facilities.

In March of 2008, a Second Settlement Agreement setting forth these provisions was proposed by the parties and submitted to the court. The court held a fairness hearing on May 22, 2008, and heard supporting testimony from class members and DDS Commissioner Elin Howe, as well as objections from a number of guardians whose family members were then at Seven Hills, a pediatric nursing facility in Groton. The court approved the agreement on June 16, 2008. *See Rolland v. Patrick,* 562 F.Supp.2d 176 (D.Mass.2008). In doing so, the court concluded that the agreement "will enhance services to class members as well as significantly increase the number

of community settings where the needs of many of them could be better served." *Id.* at 179.*

As described by both Plaintiffs and Defendants, the implementation of the Second Settlement Agreement has been characterized by significant collaboration. Once approved, for example, the parties held quarterly meetings at which the Court Monitor would review her findings and flag concerns about multiple issues ranging from health care for individual class members to problematic nursing facilities. The meetings also provided an opportunity for the parties to discuss implementation timetables, interim services for class members still in nursing facilities, and reports of class members flourishing in new community residences. These meetings, described by Plaintiffs as "candid and constructive," helped avert further noncompliance.

### ACTIVE TREATMENT

As the history of this litigation reveals, "active treatment" was an ongoing if not dominant issue, from its very definition to its implementation. Indeed, the inability of Defendants to fully implement active treatment for class members in the numerous and widely scattered nursing facilities in the Commonwealth led directly to the Second Settlement Agreement. In short, the agreement reflected the considered judgment of the parties and, in turn, the court that expanding community placement could actually free active treatment resources for a more limited population of no more than 50, namely, those class members not on the community placement list.

---

* The Groton parents/guardians, it should be noted, moved to decertify the class and, as well, appealed the court's approval of the Second Settlement Agreement. The court denied the motion to decertify, *see Rolland v.* *Patrick,* 2008 WL 4104488 (D.Mass. Aug. 19, 2008), and on January 19, 2010, the First Circuit Court of Appeals affirmed the court's judgment approving the settlement. *See Voss v. Rolland,* 592 F.3d 242 (1st Cir.2010).

This redirection was not without some controversy. First, given Defendants' previous non-compliance, the court was desirous of ensuring active treatment in accord with its prior rulings to *all* class members who remained in nursing facilities, whether they were destined for community placement or not. Indeed, there was a significant number of class members who, although on the community placement list, would remain in nursing facilities for anywhere up to another four years. Second, there were yet other class members on the placement list, who, for myriad reasons, might never move to the community and were, therefore, in need of immediate services.

To address these concerns, the parties incorporated the concept of "transition services" into the Second Settlement Agreement; these services, Defendants report, have also been pivotal to facilitating community placement. In addition, the parties, with the assistance of Ms. Rucker, eventually reached another compromise: the Court Monitor would conduct active treatment reviews and make recommendations for all individuals remaining on the community placement list, and Defendants would undertake reasonable efforts to implement those recommendations, although such efforts were not required as a condition of dismissal of this action. Ms. Rucker later determined that 76% of her recommendations had been implemented, and Plaintiffs represent that this percentage is within an acceptable range.

Most importantly, Defendants have acknowledged that the Second Settlement Agreement contemplates that their work relative to the provision of active treatment will not be complete as of dismissal of this action. Rather, Defendants understand, additional efforts will be required to ensure the provision of active treatment to all class members who remain in nursing facilities. (*See* Defendants' Memorandum of Law Regarding Final Report (Document No. 573), at 3 n. 2.) As represented by Defendants at the May 8th hearing, the same holds true for diversion and the maintenance of community residential capacity.

### Compliance

■ The parties agree that, in assessing Defendants' compliance with Paragraph 50 of the Second Settlement Agreement, the standard to be applied by the court is one of "substantial compliance." *See Langton v. Johnston,* 928 F.2d 1206, 1220–23 (1st Cir.1991) (noting that the consent decrees at issue, "like most such decrees, were susceptible to satisfaction by diligent, good faith efforts, culminating in substantial compliance"; that "letter-perfect compliance" is not required; and that "officials operating under a public law decree are required to employ good faith efforts to satisfy its demands, and fault should not be found if they have implemented its dictates to the extent practicable"); *U.S. v. Massachusetts,* 890 F.2d 507, 509 (1st Cir. 1989) (in determining compliance with consent decree court must determine "whether the objectives of the decree have been substantially achieved"); *cf. Rolland,* 138 F.Supp.2d at 117–19 (discussing "substantial compliance" with respect to the provisions of the First Settlement Agreement). With that standard in mind, the parties further agree that Defendants have met their obligations under the Second Settlement Agreement. As Defendants describe in their Addendum to their Final Report (Document No. 577), as of January 29, 2013, 648 class members have been placed in the community with appropriate supports and, during the following two months, an additional 31 class members were scheduled to move into community homes. This amounts to 679 class mem-

bers placed in the community, more than required by the Second Agreement.

The parties also agree that Defendants have satisfied the requirement that they implement the Court Monitor's recommendations for active treatment for those class members not recommended for community placement. There were arguably 44 such class members, but two had since passed away and one had actually moved into the community. Defendants represent that they resolved all of the Court Monitor's 332 recommendations for these individuals, and Plaintiffs have agreed.

### THE PARTIES

This case, of course would never have been pursued without the courage and participation of the named plaintiffs, Loretta Rolland in particular. The court was especially pleased that Ms. Rolland could attend the final hearing on May 8, 2013. In addition, the court had the privilege of meeting quite a few other class members, a handful at court proceedings and a much larger number when it took to the field, first before its approval of the Second Settlement Agreement and more recently in the Summer of 2012 when, over the course of three days, it visited, in the company of both Plaintiffs' and Defendants' counsel, nursing facilities and community residences throughout the Commonwealth. The case was winding down and the court wanted to ensure that its efforts and those of the parties were bearing fruit.

The court was not disappointed. The community residences in particular, both established and newly minted ones, made clear that many class members were not only able but fortunate enough to live at "home." The improvements were often subtle: residents having their own rooms, experiencing less stress, sleeping through the night, exercising more independence, and hosting family members in comforta-

ble surroundings. As the Court Monitor suggested, "[e]xpanding the capacity of the community, thus enabling class members to live in their own homes, is likely to be the most important legacy of this case." (Court Monitor's Rolland Active Treatment Report, September 30, 2012 (Document No. 570), at 25.)

The court was also able to meet and observe class members who would not be able to live in community residences but who were receiving enhanced services because of improvements in the provision of active treatment. To be sure, the court remains concerned about those class members who continue to reside singly in nursing facilities, often without active treatment, when it is obvious that they could fare far better in community residences. The reasons for this state of affairs vary but, in the court's view, are too often grounded in unfounded fears of change and risk on the part of parents and guardians. The court, of course, recognizes that the plight of their loved ones is often complicated; nonetheless, the court believes, the parents and guardians of individuals who remain in nursing facilities would do well to visit community residences where class members with similar limitations have thrived.

The court also admires the courage and foresight of Plaintiffs' counsel, most particularly Steven J. Schwartz, Cathy E. Costanzo and Frank J. Laski, who have been involved every step of the way. Undertaking a class action is no easy task, risking as it does the expenditure of significant time, effort and resources without any assurance that the action will prevail and fees and costs recovered. Despite these daunting barriers, Plaintiffs' counsel succeeded in their quest and served their clients well, winning the argument about class certification, establishing the scope of active treatment both before this court and

on appeal, significantly expanding community residences, convincing the court that a monitor was needed, defeating efforts to decertify the class and, in the end, improving the lives of individuals throughout the Commonwealth. Granted, they also came up short at times, for example, failing to convince the court that Defendants had not complied with the diversion provisions of the First Settlement Agreement. *See Rolland v. Patrick*, 2007 WL 184626 (D.Mass. Jan. 16, 2007). Plaintiffs' counsel, however, did prevail—and, in turn, Defendants as well—by knowing when to compromise. At two important junctures in particular, the parties measured their respective cases, concerns and interests, and entered into distinct settlement agreements which achieved important and, hopefully, lasting benefits for class members and the Commonwealth itself.

Plaintiffs' counsel, themselves, heap praise on Elin Howe, who became Commissioner in 2007, at about the time Ms. Rucker was appointed Court Monitor. It is praise well deserved. "The openness and directness of the Commissioner and her senior staff," they state, "significantly contributed to the collaborative atmosphere that now characterizes the parties' relationship in this case." (Plaintiffs' Report on the Status of Compliance (Document No. 578), at 13.) Moreover, Plaintiffs' counsel assert, "the Commissioner's commitment to implementing the community placement, diversion, and active treatment provisions of [the] Second Settlement Agreement was unmistakable." (Id.) That commitment, they state, was also reflected in a new DDS policy that denies facility admission to individuals with I/DD who have been offered a community alternative. (Id. at 13–14.) Finally, Plaintiffs' counsel point out that the Commissioner was instrumental in securing necessary resources for state-of-the-art accessible homes and an enhanced community-based service infrastructure. (Id.)

DDS staff members also deserve much credit and, from the court's point of view, that can best be described in the person of Deb Grzywacz. In mid-June of 2011, Ms. Rucker informed the court that, because of her medical condition, Ms. Grzywacz was unable to continue her role as DDS liaison. The court wrote to Ms. Grzywacz and expressed its deep appreciation for all she had done to ensure that class members had received the care and attention called for by the parties' settlements. The court also shared with Ms. Grzywacz Ms. Rucker's glowing description of her work and her commitment. "The passion with which you have accomplished your tasks," the court wrote, "is not only admirable but an example of the way in which civil servants often do their work with little public recognition."

The letter to Ms. Grzywacz continued: "The role of a court in addressing cases is an important one, of course, but also limited. A court can rule on disputes, oversee settlements, and resolve conflicts as best it can. But it often does so removed from the effort that the parties themselves, their attorneys, and their staffs undertake day-to-day, week-to-week and, as in the case of *Rolland,* year-to-year, to make sure that the lives of people with real problems are eased, enhanced, and improved. Ms. Rucker's call about you, therefore, has been a welcomed opportunity for [the court] to remember all those who toil daily in this effort." This Memorandum is yet another opportunity to convey the court's appreciation to all those agency employees who do their work, often their life's work, with the same care and concern for residents, families and guardians as had Ms. Grzywacz.

### THE COURT MONITOR

Ms. Rucker has been key to the implementation of the Second Settlement Agreement. Her leadership, style, and involvement have been instrumental in focusing the parties' efforts and promoting a positive tone. She regularly established the agenda and facilitated discussions at the quarterly meetings; she adopted a training and quality improvement approach to her evaluations, which was well received by nursing facilities, families, class members, and the parties; she was transparent in her reviews, soliciting comments from the parties as well as interested persons; and, as importantly, she was rigorous in her evaluations. Further, Ms. Rucker offered recommendations which often led to significant changes in past practices; for example, the active treatment rating for Seven Hills, the pediatric facility where most of the class members not recommended for community placement reside, improved significantly from 2008 to 2012. Finally, Ms. Rucker's expertise and commitment were such as to actually prompt Defendants to ask her to develop a protocol for post-dismissal reviews and to train surveyors from the Department of Public Health who will be conducting future active treatment reviews at the pediatric facilities. Defendants' decision to call upon Ms. Rucker for this purpose was wise: rigorous on-going monitoring, albeit in–house, will be needed to ensure that the gains made as a result of this litigation are not lost.

The court will be forever grateful to Ms. Rucker. She won the trust of the parties and enabled them to fulfill their respective responsibilities. And in doing so, Ms. Rucker made the court's burden, if burden it is, as light as it could possibly be, she fulfilled her responsibilities better than the court ever could have imagined, and she accomplished her tasks with just the right balance of authority and grace. The court is in her debt and to the seventeen quality review judges who worked with her.

### CODA

In many ways, this litigation had a certain perfection. When necessary, disputes were resolved by the court after the parties pursued their points of disagreement with vigor. At other times, the parties worked through their disputes with the assistance of a mediator, no doubt compromising so as to best serve their respective interests. And at yet other times, the parties were not afraid to shift gears when realizing that former agreements were falling short and that the court's orders might not be achievable without a paradigm shift. In the end, it appears, the parties' interests actually merged.

As indicated, Plaintiffs have agreed that Defendants' Final Report demonstrates substantial compliance with the final two requirements set out in the Second Agreement for dismissal of this action. Over 640 individuals have been transitioned from nursing facilities to community homes and the Court Monitor's recommendations for active treatment have been substantially achieved. At present, there are only 135 class members residing in 48 nursing facilities, down from over 1600 individuals in 300 nursing facilities at the beginning of the litigation, with many others coming and going in the interim. Moreover, active treatment is accorded to a larger percentage of individuals in nursing facilities, particularly at the three remaining pediatric facilities.

■ Of course, the celebration of this success, as reflected in the presentations at the May 8, 2013 hearing, is tempered by the fact that, as described, much work remains to be done. Still, the time has come for Defendants to regain autonomy in the provision of critical services to a vulnerable population. As the Supreme

Court said in *Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990), "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." Given their substantial compliance with the Second Settlement Agreement and pursuant to its terms, Defendants have earned that respect and, as a result, the right to meet their ongoing obligations to class members without judicial supervision.

For all these reasons, this action is hereby DISMISSED.

IT IS SO ORDERED.