UNITED STATES of America,
Plaintiff,

v.

State of TENNESSEE,
et al., Defendants,

and

People First of Tennessee,
et al., Intervenors,

Parent–Guardian Association of
Arlington Developmental
Center, Intervenors.

No. 92–2062–D/A.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 21, 2003.

770

Nicole Porter, Janine Scott, U.S. Department of Justice, Special Litigation Section, Thomas F Urban, II, United States Department of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, Aileen M. Bell, U.S. Department of Justice, Civil Rights Division, Washington, DC, for USA, plaintiff.

Earle J. Schwarz, Esq., Glankler Brown, PLLC, Memphis, Edward G. Connette, Esq., Lesesne & Connette, Charlotte, NC, Jack W. Derryberry, Esq., Ward Derryberry & Thompson, Nashville, Judith A. Gran, Esq., Public Interest Law Center of Philadelphia, Frank J. Laski, Esq., Public Interest Law Center of Philadelphia, Philadelphia, PA, Roger Manus, Law Office of Roger Manus, Raleigh, NC, William F. Sherman, Esq., Law Offices of William F. Sherman, Little Rock, AR, Diane C. Spears, Williams & Prochaska, P.C., Memphis, for Carl Beard, by his next friend Wendy Kurland, People First of Tennessee, on behalf of all its members, Sandra Howard, by her next friend Elizabeth Henderson, Herman Walter Runions, by his next friend Sarah R. Todd, Harvey Richard Watson, by his next friend Jodie Wheeler, Clarence Wilson, by his next friend Wilma Williamson, Keith Collins, by his mother and next friend Joyce Cisco, Stevelyn Danieal Tucker, by her parents and next friends Carolyn and Steve Tucker, West Tennessee Parent Guardian Association, intervenors.

Leo Maurice Bearman, Jr., Esq., Baker Donelson Bearman & Caldwell, Jonathan P. Lakey, Esq., Burch Porter & Johnson, Memphis, Dianne Stamey Dycus, Esq., Attorney General and Reporter, Civil Division, Nashville, for Tennessee, State of, Don Sundquist, Governor of the State of Tennessee, Marjorie Nelle Cardwell, Max Jackson, Superintendent of Arlington Developement Center, defendants.

## ORDER DENYING THE APPROVAL OF MEDIATION SETTLEMENT AGREEMENT

DONALD, District Judge.

This matter is before the Court on the joint motions of the parties, the United States of America, the State of Tennessee, and People First of Tennessee to approve the proposed Mediation Settlement Agreement ("MSA"). The M.S.A. § proposes a global settlement of all claims arising in connection with three appeals that were pending before the United States Court of Appeals for the Sixth Circuit in the matter of *United States v. Tennessee*, Nos. 00–6120, 00–6265 and 00–6476. For the reasons set forth below, the proposed M.S.A. § in this class action is rejected as not being in the best interest of the class.

## I. *BACKGROUND*

On December 12, 1991, five Arlington Developmental Center ("ADC") residents and People First of Tennessee brought an action against the State of Tennessee and ADC, *People First of Tennessee v. Arlington Developmental Ctr.*, No. 92–2213 (W.D.Tenn.1992)("*People First* case"), alleging that the conditions at ADC violated the constitutional and statutory rights of Arlington residents and those at risk of placement there. Plaintiffs sought injunctive and declaratory relief. The district court permitted the Parent–Guardian Association of Arlington Developmental Center (PGA) to intervene in the *People First* case.

Subsequently, the United States filed an action against the State of Tennessee pursuant to 42 U.S.C. § 1997. The United States asserted that the State had failed to provide humane conditions and adequate treatment to ADC residents. *United States v. Tennessee*, No. 92–2062 (W.D.Tenn.1992)("*United States* case"). After a trial in the *United States* case, the court entered judgment against the Defendants finding that the conditions at ADC violated the due process rights of the residents. In August of 1994, the United States and the State of Tennessee reached an agreement on the terms of the remedial order to correct the violations. The court entered the remedial order on September 2, 1994. On September 26, 1995, the court adopted the findings from the *United States* case as findings in the *People First* case and certified a class that included all past, present, and future residents.[1] Furthermore, the court named the Plaintiffs and the Intervenor in the *People First* case as Intervenors in the *United States* case.

The court ordered the State to develop a comprehensive plan for bringing ADC into constitutional and statutory compliance, including a community plan for placing ADC residents into community placement. After a hearing, the court approved the

---

1. The *People First* certified class includes persons who: (1) resided at ADC on or after December 12, 1989; (2) are currently residing at ADC; (3) have been transferred from ADC to other settings but remain "Defendants' responsibility;" and (4) are at risk of being placed at ADC. *See* Order Granting Mot. To Certify Case As A Class Action entered September 26, 1995, *People First of Tennessee v. Arlington Developmental Ctr.*, No. 91–2213 (W.D.Tenn.1991). A dispute arose at a hearing on March 2, 2000, concerning the meaning of persons who "are at risk of being placed at ADC."

State's proposed community plan on August 21, 1997. On June 28, 1999, the court ordered the creation of workgroups to facilitate implementation of the plan and clarified the definition of the *People First* class.[2] On January 11, 2000, the court suspended activity of the workgroups for six months. On August 23, 2000, the court temporarily extended the suspension of the workgroups.

The orders clarifying the definition of the "at risk" class and suspending the workgroups were appealed to the United States Court of Appeals for the Sixth Circuit. The parties chose to mediate the appeals. The Sixth Circuit Mediator initially conducted the mediation. Subsequently, the parties participated in private mediation and ultimately reached a proposed resolution. The parties participated in numerous mediation sessions from March of 2001 through October of 2001. On December 10, 2001, the parties entered into a proposed mediation settlement agreement, which was filed with this Court.

The proposed mediation agreement contains six primary terms and conditions and various components for each term and condition. The primary terms of the M.S.A. § provide that

1. settlement is conditioned upon the August 24, 2000 Order that suspended the workgroup activity being vacated, as well as, that portion of the August 12, 1997 Order relating to workgroups (MSA § XII);

2. settlement is conditioned upon the July 17, 2000 Order regarding the scope of the "at risk" class being vacated and the issuance of a new Order that redefines the *People First* "at risk" class as those persons who were placed in a private intermediate care facility/mental retardation ("ICF/MR") after admissions to ADC were closed on September 2, 1994, and before the closure of ADC (MSA §§ XII, XIII);

3. the State is required to develop a closure plan for ADC that must be reviewed by the parties and approved by the Court (MSA § II);

4. the State must improve the quality of community-based services consistent with reasoned professional judgment (MSA § VI);

5. the State must increase the array of community residential options to meet the needs of the class members who will transition from ADC to the community (MSA § IV); and

6. the parties and Court Monitor shall meet for the purpose of monitoring the progress of the State with the ADC Closure Plan and the community initiatives plan (MSA § IX).

The parties filed a joint motion requesting that this Court vacate the orders on appeal and that the mediation settlement agreement be entered with this Court. On December 13, 2001, this Court granted the parties' motion. The parties then filed a joint motion with the United States Court of Appeals for the Sixth Circuit seeking a remand. On January 8, 2002, the intermediate appellate court granted the joint motion to remand. *United States v. Tennessee,* Nos. 00–6120, 00–6265, and 00–6476 (6th Cir.2002). On February 13, 2002, this Court preliminarily approved the proposed

---

**2.** This Court clarified the "at risk of being placed at Arlington Developmental Center" portion of the People First class as "all individuals who reside in the geographic region served by Arlington Developmental Center ... and who have demonstrated medical needs sufficient to require care in the absence of home or community based services." *See* Mem. Op. And Order entered June 28, 1999, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992).

settlement, designated a notice process, and scheduled a fairness hearing on April 30, 2002. The Court ordered the parties to provide notice to all class members by February 28, 2002, that all parties interested in commenting on or objecting to the settlement should submit comments to the Court by April 20, 2002. Likewise, the notice advised all those wishing to participate in the fairness hearing to notify the Court by April 20, 2002.

On April 30, June 27, and June 28, 2002, this Court held a hearing on the fairness of the proposed settlement agreement. At the hearing, the Court heard testimony from the Court Monitor, experts, state officials, and interested parties concerning the fairness, adequacy, and reasonableness of the agreement. The Court Monitor, state officials, and some experts testified that the proposed M.S.A. § is in the best interest of the class and that the closure of ADC is a feasible and desirable resolution to the case. The guardians and family members of the class and an expert testified in opposition to the Court's approval of the proposed M.S.A. § because they asserted that the community cannot serve all class members upon the closure of ADC. The Court also accepted written comments from members of the class and/or their parents and guardians, and other parties. The letters received overwhelmingly expressed opposition to the closure of ADC. Parents and guardians acknowledged the benefits of community placement for some members, but testified that for a large population of members with severe, multiple developmental disabilities, placing them in the community would be tantamount to a death sentence.

People First of Tennessee, the State, and the United States recommended that the M.S.A. § be approved. PGA opposed the approval of the MSA. PGA's opposition to the M.S.A. § emanated from the provision in the agreement requiring the ulti-

mate closure of ADC. PGA's and class member guardians' and family members' objections may be classified into three general categories: 1) closure of ADC, 2) community capacity to serve persons who are behaviorally and medically fragile, and 3) community capacity to serve increased transitions from ADC.

## II. *STANDARD TO ASSESS THE SETTLEMENT AGREEMENT*

 Rule 23(e) of the Federal Rules of Civil Procedure provides that " [a] class action shall not be dismissed or compromised without the approval of the court . . . ." Courts maintain a strong presumption in favor of settlement agreements because such agreements are a preferred means of dispute resolution. *In Re Telectronics Pacing Systems, Inc.,* 137 F.Supp.2d 985, 1008 (S.D.Ohio 2001). A court must determine whether the proposed settlement is "fair, adequate, and reasonable under the circumstances, as well as consistent with public interests" when examining the agreement. *Id.* (quoting *Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38, 42 (6th Cir.1990)). A court must also consider whether the class is better served if the litigation is resolved by the proposed settlement rather than if pursued to a verdict by a jury. *Id.*

 To determine whether the proposed settlement is " fair, adequate, and reasonable," a court must evaluate the following factors:

1. the plaintiff's likelihood of ultimate success on the merits balanced against the relief offered by the proposed settlement agreement;

2. the complexity, expense, and likely duration of litigation;

3. the stage of the proceedings and the amount of discovery;

4. the judgment of experienced trial counsel;

5. the nature of the negotiations;

6. the objections, concerns and comments of the class members and other interested parties; and

7. the public interest.

*Southern Ohio Correctional Facility,* 173 F.R.D. 205, 212 (S.D.Ohio 1997). "The district court enjoys wide discretion in assessing the weight and applicability of these factors." *Granada Inv., Inc. v. DWG Corp.,* 962 F.2d 1203, 1205–06 (6th Cir.1992). A strong presumption exists in favor of deferring to the judgment of a federal government agency that has negotiated and submitted a proposed settlement in an effort to enforce federal laws. *See Michigan v. Thomas Solvent Co.,* 717 F.Supp. 507, 515 (W.D.Mich.1989). A court cannot "modify the proposed settlement, but must approve or disapprove the proposed settlement as a whole in relation to all of those concerned." *In Re Telectronics Pacing Systems, Inc.,* 137 F.Supp.2d at 1008.

## III. *ANALYSIS*

### A. *Factor One: Plaintiff's Likelihood Of Success On The Merits Balanced Against The Relief Offered By The Proposed Settlement Agreement*

■ The parties agreed to the proposed M.S.A. § during mediation proceedings that were entered into to resolve three appeals related to the district court's Order Regarding Scope of "At Risk" Population and Order Granting in Part Defendant's Motion Suspending the Workgroup Activities. A determination of Plaintiff's likelihood of success on the merits, therefore, requires this Court to examine these two orders.

On July 17, 2000, the court concluded that "the 'at risk' portion of the class consists of all individuals who reside in the geographic region served by [ADC] and who have demonstrated medical needs sufficient to require institutional care in the absence of home or community based services." *See* Order Regarding Scope Of "At Risk" Population, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). The definition advanced by the State for the "at risk" class was narrowly defined as "those individuals who have actually been admitted to ADC since the class was certified." *Id.* In rejecting the State's proposed definition, the court opined that "such an interpretation makes the at risk population a null set because ... no individuals have been admitted to ADC since the class was certified." *Id.* Furthermore, the more expansive definition adopted by the court "utilizes existing Medicaid eligibility guidelines as objective medical criteria for determining which individuals are 'at risk' of being placed at ADC." *Id.*

The State appealed the order, and during mediation, the parties adopted another definition of the "at risk" class contingent upon the approval of this Court. The definition provides:

[A]ll persons at risk of being placed at [ADC] shall be construed as including only:

1. Those persons actually placed at Arlington Developmental Center subsequent to entry of the Court's Order Granting Class Certification on September 27, 1995; and

2. Those persons:

(a) placed in private ICF/MR facility in the West Tennessee Region subsequent to closure of admissions to [ADC] on September 2, 1994, and prior to the closure of [ADC]; and

(b) who apply, within one year of initial notice of eligibility, to receive services under any Tennessee Home and Community Based Waiver program for peo-

ple with mental retardation and for which they are eligible.

MSA § XIII (A).

A comparison of the district court's definition with the parties' proposed definition of the "at risk" class reveals that the definition contained in the M.S.A. § is more narrow than the court's definition. Fewer persons, therefore, would be classified as "at risk" if the M.S.A. § is approved. This Court concludes that Plaintiff was likely to succeed on the merits on appeal as to the definition of the "at risk" class. The court previously ruled that "the interpretation of the class definition advocated by Defendants is wholly unsupported by the record in this case . . . ." *See* Order Den. Defs.' Mot. To Alter Or Am. J. And Order Den. Mot. For Stay Pending Appeal, *United States v. Tennessee*, 798 F.Supp. 483 (W.D.Tenn.1992). Accordingly, a balance of Plaintiff's likelihood of success on the merits as to the "at risk" class appeal against the relief offered by the proposed M.S.A. § establishes that the class would receive a lesser degree of protection from the MSA's definition of the "at risk" class. As such, the appeal of the "at risk" definition issue, on balance, weighs in favor of denying the proposed MSA.

Plaintiff and Intervenors appealed the court's suspension of the workgroups. When the workgroups were suspended initially in January of 2001, the court reasoned that the temporary suspension of the workgroups was necessary in order to focus on other areas of work that had to be brought to a timely conclusion. The court concluded that resources, such as time and money, would be better served by temporarily suspending the use of the workgroups. The court, however, did not intend to suspend the workgroups forever. This is evidenced by the court's statement that

the workgroups [are regarded by the court] as exactly what the parties said

they were in their consent order as important in the case, and [the court has not] changed [its] view on that. [The court] said [the parties] had to prioritize matters . . . . [The court's] thought on [suspension] is that [the workgroups] are certainly not going to [be] suspended [ ] forever . . . .

*See* Tr. of Status Conference on August 17, 2000, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992). This Court, therefore, concludes that the Plaintiffs' appeal of the suspension of the workgroups order had little likelihood of success on the merits as the court's actions were inherently discretionary. Furthermore, the proposed M.S.A. § would potentially eliminate the necessity of workgroups.

Ruby Kay Moore, an expert who reviewed ADC and the community programs, opined at the fairness hearing that the M.S.A. § has "numbers and schedules and time line sources and conditions that make [it] more likely that it will actually be achieved." Tr. of Fairness Hr'g at 383–84, Test. of Ruby Kay Moore, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn. 1992). She further stated that the M.S.A. § is a plan "in which everybody has agreed to how [it] will go," and that it is "a collective responsibility to keep it on track and to participate in saying how [the parties] shall [ ] best proceed so that [the parties'] concerns are all met." *Id.* In sum, the implementation of the terms of the M.S.A. § would be dependent upon the parties' determination, at a future date, of what the best approach is to reach the objectives of the MSA.

The workgroups were intended to facilitate implementation of the community plan. The proposed M.S.A. § appears to contemplate the utilization of controls and mechanisms for the implementation of the terms of the agreement. The proposed M.S.A. § would result in the ultimate and

imminent closure of ADC. The closure would require, therefore, a complete transition to community care providers. The closure plan drafted pursuant to the M.S.A. § could include the utilization of workgroups, but does not appear to require workgroups. Balancing Plaintiff's likelihood of success on the merits as to the workgroups issue with the relief offered by the proposed M.S.A. § establishes that both could result in the use of workgroups. Accordingly, neither factor outweighs the other, and the balance is neutral in effect.

Although the balancing of the workgroups appeal is neutral, the balance of the "at risk" definition appeal favors a denial of the MSA. If the Court approved the proposed MSA, the "at risk" class definition would reduce the number of people who are eligible to receive services from approximately 1,200 to approximately 100 persons. This substantial reduction would result in the denial of services to numerous persons that the district court determined were included in the class. Moreover, the Court finds that such a drastic reduction would expose large numbers of class members to potential harm. Accordingly, the Court concludes that balancing Plaintiff's likelihood of success on the merits as to the three appeals against the relief offered by the settlement agreement weighs in favor of denying the proposed MSA.

### B. Factors Two And Three: The Complexity, Expense, And Likely Duration Of Litigation; and The Stage Of The Proceedings And The Amount Of Discovery

■ The Court will examine these factors together given their interrelation. These consolidated actions were filed more than a decade ago. After a trial in the *United States* case, the district court entered judgment against the Defendants finding that the conditions at ADC violated the due process rights of the residents. In August of 1994, the United States and the State of Tennessee reached an agreement on the terms of the remedial order to correct due process violations. Since that time, a long history of litigation, remediation, contempt motions and findings, monitoring enforcement actions, and negotiation has occurred.

No question exists as to the complexity of the case and the substantial expense that has been generated in an attempt to comply with the remedial order. The complexity of this litigation, and the stage of the proceeding involved therein, are exemplified by the three separate appeals that were pending in the United States Court of Appeals for the Sixth Circuit and by the extensive litigation history in an eleven year-old case. Moreover, the litigation expenses incurred in the case include numerous attorney and expert fees. Accordingly, the Court concludes that these factors weigh in favor of the approval of the proposed MSA.

### C. Factors Four and Five: The Judgment Of Experienced Trial Counsel; and The Nature Of The Negotiations

■ It is undisputed that several experienced trial attorneys and senior representatives of the parties have participated extensively and, therefore, are aware intimately of the complexity and seriousness of the case. Most of the trial counsel involved in this litigation have several years of legal experience in litigation. With the exception of PGA and its counsel, all of the attorneys and parties agree that the proposed M.S.A. § should be approved.

The testimony elicited at the fairness hearing indicates that the negotiations were arms-length. The Court Monitor, Dr. Nancy K. Ray, participated in some of the mediation sessions and had input on the document. *See* Tr. of Fairness Hr'g at

69 and 85, Test. of Dr. Ray, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn. 1992). The Court Monitor recommended approval of the MSA. *Id.* at 69 and 89–90.

In addition to the Court Monitor, all of the parties, including PGA, participated in extensive negotiations and were represented by counsel at all stages of the negotiations. *See* Tr. of Fairness Hr'g at 588–624, Test. of Carolyn Cowans, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). PGA had three or four representatives at the mediation sessions at all times. PGA also had two board meetings separated by a period of a week during which they consulted with counsel prior to authorizing its then-President, Mr. Richard Johnson, to sign the MSA.[3] *Id.* The mediation session took place over a number of months and included a number of meetings between the parties. *See id.* at 589–90 and 614–24.

The negotiations were conducted initially under the supervision of the Sixth Circuit mediator and the Sixth Circuit rules concerning mediation and subsequently under the auspices of a private mediator. All parties participated in all the negotiations, and all parties were represented by counsel who were experienced in this matter from its beginning. The Court Monitor also participated in the negotiations. The Court holds, therefore, that the nature of the negotiations were fair, the parties were under no undue influence, and there was no collusion between the parties. Ac-cordingly, these factors weigh in favor of the approval of the proposed MSA.

## D. *Factor Six: The Objections, Comments, And Concerns Of Class Members And Other Interested Parties*

■ This Court received written comments and testimony from class members, relatives and guardians of class members, and other interested parties. At the fairness hearing, the Court heard oral testimony from approximately sixteen relatives or guardians of class members. Furthermore, the Court received approximately 100 letters in opposition to the proposed MSA. The overriding concern expressed in these letters and testimony relate to the proposed MSA's closure of ADC and the vulnerability and medical fragility of class members. Included in an evaluation of this factor, therefore, are specific concerns expressed in these letters and testimony.

Dr. R.F.A., the single parent of an ADC resident, expressed his concern via letter about the proposed closure of ADC. His daughter who is currently thirty-five-years old has resided at ADC since the early 1970s. Dr. A. stated that "[he] knows how difficult it is to provide for such special needy individuals who are so totally dependent for their daily needs, both nutritional and hygienic." He opined that " [t]o close [ADC] would be a real-time travesty for this community and for these residents in particular. Closing Arlington would be tantamount to throwing out not just the

---

**3.** As mentioned previously, PGA initially approved the MSA. At the fairness hearing, however, PGA opposed the adoption of the MSA. PGA alleged that its Board of Directors were required to maintain the confidentiality of the mediation proceedings in order to participate. PGA asserted in effect, therefore, that it approved the M.S.A. § under duress because it was unable to disclose the terms of the M.S.A. § to the members of the PGA. When PGA signed the MSA, however, it stipulated that it retained objections and reserva-tions as to certain terms of the agreement. None of these objections and reservations included the proposed closure of ADC. This Court concludes that PGA's president had the authority to agree to the M.S.A. § and that PGA's adoption of the M.S.A. § is binding. In order to assess the fairness of the MSA, the Court permitted PGA to proffer class and expert testimony concerning the MSA. This Court will consider, therefore, this testimony to thoroughly assess the fairness of the proposed MSA.

baby with the bathwater, but indeed to throwing out all baby's [sic] with the bathwater." While he is not an expert on these issues, the Court will not disregard his background knowledge.

C. A., the sister and co-guardian of an ADC resident, also wrote a letter to the Court. Her sister, who is severely retarded and confined to a wheelchair, has been a resident at ADC since 1971 or 1972. Ms. A.'s sister was placed in a nursing home for a short period of time. Ms. A. stated that

> [t]he nursing home did not know how to deal with a severely retarded person. They just wanted to keep her sedated all of the time. [S]he stayed agitated and depressed all of the time[,] and she became aggressive. She tore her clothes, picked at herself until she had sores all over her arms and she even tore the curtains down off the walls in her room at the nursing home.

In sum, Ms. A. expressed her concern that her sister would not survive very long if forced to leave ADC.

Rick and Suzanne B. are the parents of an ADC resident. Their daughter has lived at ADC for approximately twenty years. Their daughter is fed with a feeding tube and breathes through a tracheal tube. She is unable to speak and is profoundly retarded. Furthermore, she suffers from epilepsy and Wilson's Disease. She requires multiple medications, which must be monitored by laboratory analysis. Accordingly, the B.'s daughter must be attended by a respiratory therapist four times a day and receive around the clock care by nurses and doctors. Mr. and Mrs. B. believe that an ICF/MR facility better serves the medically fragile in the community such as their child.

June D.C. wrote the Court to object to the closing of ADC. Ms. C. is the sister of an ADC resident. Her brother, who has resided at ADC for thirty-two years, is severely retarded. He has severe receptive and expressive language delay. Ms. C.'s brother also engages in self-injurious behavior. Because of his history of low body weight, he must be closely monitored at mealtime and requires the services of a licensed dietician. Ms. C. and her family fear that her brother's health and life will be at risk if placed in the community.

Carolyn C., the mother of an ADC resident, relayed her concerns about the closure of ADC. Some of the medical conditions from which her son suffers include cerebral palsy, severe spastic quadriplegia, seizure disorder, gastroesophageal reflux disease, dysphagia, and scoliosis. He is profoundly retarded and is unable to perform any daily living skills. He requires twenty-four hour care. Furthermore, Ms. C.'s son faces significant physical and nutritional care challenges. He uses a customized seating system adapted to a wheelchair base for mobility. He also requires custom equipment for alternate positioning purposes. During mealtime he uses adaptive feeding equipment, including a special headrest insert. He is at great risk of aspiration, and in fact has choked before. In such instances, he must receive immediate attention. Ms. C. opined that "the centralized service delivery system ... [which ADC] offers [is] the best model of care for [her son]." Moreover, people with mental retardation and developmental disabilities are unique, and the configuration of the care systems must be equally unique. She believes that a serious lack of medical supports in the community system exists. Ms. C. believes, therefore, that the elimination of ADC in the absence of an equitable placement would place the medically and behaviorally fragile at risk of great harm and possibly death. She also testified that she is concerned that many people in the community receive their medical treatment at ADC because adequate medical care is unavailable in the

community. Tr. of Fairness Hr'g at 582, Test. of Carolyn C., *UUnited States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn. 1992). Ms. C. testified that with the closure of ADC, there will not be a sufficient "safety net" for people transitioned into the community who are in crisis situations and need to return. *Id.* at 586.

Barbara Cn. and Walter Cr., family members of ADC residents, also wrote the Court opposing the closure of ADC. Both residents are severely retarded, non-ambulatory, and mute. One is fed by a feeding tube, and both require around the clock care. Ms. Cn. and Mr. Cr. question the State's ability to provide adequate care to persons with such severe conditions in a community setting.

Joe H. expressed concern that his sister, an ADC resident, would have a difficult time adjusting to a move and that such a move would shorten her life. Mr. H. also is concerned that housing in safe communities is not readily available because potential neighbors attempt to block ADC residents from moving into their communities.

At the fairness hearing, Nadine Mc. objected to the closure of ADC. Her son has resided at ADC for fourteen years. Tr. of Fairness Hr'g at 477, Test. of Nadine Mc., *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992). He is non-ambulatory, blind, and fed via a feeding tube. *Id.* He suffers from aspiration pneumonia approximately three or four times per year, and he requires oxygen for the least illness. *Id.* Ms. Mc.'s son has been resuscitated twice. *Id.* She opined that had her son not received immediate medical aid, he would have died. *Id.* at 477–78. She questions whether a community setting could adequately address such pervasive emergency needs. Even if such services exist, Ms. Mc. believes that her son's health is so fragile that he would not survive in the community. *Id.* at 478.

Barbara D., the parent of an ADC resident, also testified at the fairness hearing. Ms. D.'s daughter has resided at ADC since 1974. Tr. of Fairness Hr'g at 474, Test. of Barbara D., *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992). Her daughter is terminally ill. *Id.* Ms. D. testified that her daughter could not survive in the community even though other class members may be capable of doing so. *Id.* Ms. D. concluded her testimony by stating that she is so worried about the proposed closing of ADC that she "actually prays to god that [her daughter] will die before this settlement is [approved.]" *Id.* at 475.

Nora S. is the mother of a class member who has been transitioned into the community. Ms. S. testified that her son goes to ADC almost everyday. Tr. of Fairness Hr'g at 668, Test. of Nora S., *Unites States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). She further stated that all of his medical and dental care is provided by ADC. *Id.* Ms. S. expressed her hope that ADC would remain open to care for those that are medically fragile and to provide medical services to those in the community. *Id.*

At the fairness hearing, Dr. Ray testified that the M.S.A. § proposed closure of ADC with the placement of class members into the community is a viable plan of which she approves. Tr. of Fairness Hr'g at 70–72, Test. of Dr. Nancy Ray, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). She pointed to other examples where community placement has been successful, and noted that the trend is toward community placement for enhanced care. She also testified that some medically fragile ADC residents have already been transitioned into the community setting. *Id.* at 82–83. Dr. Ray stated that instances had arisen in which "some individuals medical needs [became] so com-

plex and they [became] so medically fragile that they [were] not [ ] able to be maintained in a small community living home...." *Id.* at 82. In some of these instances, Dr. Ray testified that the residents were placed in rehabilitation facilities, one of which is a licensed long-term hospital. *Id.* Dr. Ray stated that the health conditions of two elderly residents placed into the community deteriorated in a predictable way. *Id.* The community providers, family members, and Community Services Network ("CSN") determined that these residents "would be better cared for in [ ] an actual medical facility." *Id.* at 83. Dr. Ray also expressed concern that a community living arrangement would not be available by the proposed closure date to accommodate individuals who are ventilator dependent. *Id.* at 91–92.

Carlene Leaper, the Executive Director for Mid–South ARC and a member of the Abuse and Neglect Prevention Committee ("ANPC"), testified that the number of incidents of abuse and neglect in the community has not reduced during her six year tenure on ANPC. Tr. of Fairness Hr'g at 423, Test. of Carlene Leaper, *United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). Ms. Leaper also indicated that some suspected instances of reported abuse and neglect in the community were not investigated by the State. *Id.* at 426. Likewise, Victor T., Sr., the parent of a severely retarded ADC resident and an ANPC member, expressed his concern at the fairness hearing about the ability of the community to effectively address the needs of the medically fragile ADC residents. *Id.* at 457. Mr. T. correctly noted that the medical needs of the population are not static, and will at some time require varying response levels.

Sandra D. testified about her sister's transition into the community. Tr. of Fairness Hr'g at 469, Test. of Sandra D.,

*United States v. Tennessee,* 798 F.Supp. 483 (W.D.Tenn.1992). Ms. D. asserted that she had difficulty finding doctors in the community willing to treat her sister. *Id.* Ms. D. eventually secured medical providers for her sister with the help of CSN. *Id.* She stated that she was worried, however, about the ability of other residents to secure proper medical care in the community. *Id.* Ms. D. testified in effect that she objects to the closure of ADC because the medically and mentally fragile, even if placed into the community, need a facility to provide necessary services. *Id.* at 469–72. Ms. D. also expressed concern about the number of deaths of class member that occurred in the community. *Id.* at 472. If ADC is closed and the population is transitioned into the community, she believes this number will rise dramatically.

Rick Campbell, the Deputy Director for the Tennessee Commission on Compliance, testified concerning the possible steps that would be utilized when closing ADC to minimize disruption to the class. Tr. of Fairness Hr'g at 146–81, *United States v. Tennessee,* Test. of Rick Campbell, No. 92–2062 (W.D.Tenn.1992). Mr. Campbell stated that the State envisioned providing actual residential services to certain medically complex class members. *Id.* at 158. Further, the State would support unique homes that would be operated for persons who have the greatest medical issues. *Id.* Mr. Campbell also testified that the State would propose in the closure plan to operate State-run homes for medically complex residents and small medical units for transitions from hospitals back to the community. *Id.* at 159. Mr. Campbell admitted that in the community there are no physicians on site and most of the homes do not have nurses on duty around the clock. *Id.* at 200–01. Given the medical fragility of a large portion of the class, this must be

factored into the calculus of approval of the MSA.

Dr. James Conroy, an expert in the evaluation and research in the areas of care and service of delivery systems for persons with developmental disabilities, testified that people are better off in a community setting than in an institutional setting. Tr. of Fairness Hr'g at 274–75, Test. of Dr. James Conroy, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn. 1992). Dr. Conroy admitted, however, that a community setting is not appropriate for everyone, and that questions remain about whether the mortality rate of people in the community is greater than in institutions. *Id.* at 289. Dr. Karen Anderson, the Medical Director for CSN, also opined that medically fragile residents will receive appropriate care and support services if the proposed M.S.A. § is approved. *Id.* at 316.

Dr. Theodore Kastner, President of the Developmental Disabilities Health Alliance, testified for PGA concerning community care versus institutional care. Dr. Kastner stated that he does not believe that adequate evidence exists to show that community care is consistently better than institutional care. Tr. of Fairness Hr'g at 508, Test. of Dr. Theodore Kastner, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992). Dr. Kastner further opined that there are no states that are completely institution free. *Id.* at 512. All states have "the ability to place someone in an institution when they need to because they contract with private operators to provide [the] service or they have community [intermediate care facilities for the mentally retarded]...." *Id.* at 513. Therefore, states may close their public facilities but continue to operate institutions via private providers. *Id.*

Dr. Kastner noted that as people have moved from institutions to the community, many continue to have needs that require more intensive health care services than can be offered in group homes. *Id.* at 514. As a result, many persons are placed in nursing homes which are often ill equipped to meet the needs of persons with developmental disabilities. *Id.* Dr. Kastner opined that many developmentally disabled people do not have access to the home and community-based waiver because it is an optional service. *Id.* Persons with developmental disabilities, however, have access to nursing homes because it is an entitlement through the Medicaid program. *Id.* Dr. Kastner stated that nursing homes are not the most appropriate setting for people with developmental disabilities. *Id.* Moreover, Dr. Kastner asserted that studies indicate that there is a significant increase in the relative risk of mortality in community settings versus in institutions. *Id.* at 519. Studies also indicate that a substantial increase in actual deaths exists as opposed to expected deaths among those placed in the community. *Id.*

These are but a few samples of the comments and very grave concerns expressed by representatives and relatives of ADC class members and other interested parties. The Court believes that such comments help to contextualize the enormity of the issues represented in this lawsuit. The Court finds that these issues are not an abstraction nor can they be reduced to an academic discussion. Rather, in many cases for the families and class members, they believe that the issues are of life and death magnitude. At the very least, all parties agree that the decision will unalterably affect the ultimate quality of life for the class members.

The concerns and objections expressed by the families and guardians of the class members relate almost entirely to the closure provision of the MSA. As evidenced by the preceding statements, the overriding concern of these individuals relates

to the ability of the community to serve those class members that are medically and behaviorally fragile.

■ The Court recognizes that even when a majority of class members oppose a proposed settlement agreement, the Court may still approve the agreement if the Court finds that the settlement agreement is in the best interest of the class. *See Heit v. Van Ochten,* 126 F.Supp.2d 487, 491 (W.D.Mich.2001). In fact, the Court is mandated to evaluate the agreement based on a "best interest of the class" standard. In the instant case, approximately 100 of approximately 450 class members objected to the approval of the proposed MSA. *Cf. Rolland v. Cellucci,* 191 F.R.D. 3, 9–11 (D.Mass.2000)(holding that "no real opposition was expressed to the Settlement Agreement [by class members]."). The concerns expressed by the class and other interested parties relate to issues of life and death and the quality of life of class members. Accordingly, the Court gives great deference to the opinions of the persons most capable of determining what is in the best interest of the class members, i.e., the guardians and family of the class members. *See Rolland,* 191 F.R.D. at 12 (finding that the "Settlement Agreement ... ensures that no class member will be involuntarily transferred from a nursing home to the community.").

As noted previously, numerous people testified for the United States, the State of Tennessee, and People First of Tennessee as to the viability and desirability of closing ADC. This Court agrees that the transition of all class members into community homes is an ideal solution to the problems that exist with ADC, assuming that the community could adequately meet each member's needs. This Court, however, is highly skeptical that the complete closure of ADC, accompanied with a responsible and safe transition to the community of those class members who are the most

medically and behaviorally fragile, is possible at this time. Testimony by interested parties indicates that finding physicians willing and capable of treating class members in the community has proven difficult. The Court has not been shown sufficient evidence that this condition is going to ameliorate in the future. The Court recognizes that CSN is making substantial headway in insuring that class members in the community have appropriate medical care available. The testimony and letters received by the Court indicate, however, that many class members that have been transitioned into the community continue to rely on medical services provided by ADC. This testimony is supported by Dr. Kastner's testimony that as people have moved from institutions to the community, many continue to have needs that require more intensive health care services than can be offered in group homes.

The Court also finds troubling, testimony that persons unable to receive adequate medical care in the community may be placed in nursing homes. Nursing homes are not designed or equipped to handle the needs of class members who are medically and behaviorally fragile. Moreover, the proposed M.S.A. § will narrow the "at risk" class. This reduction of persons in the "at risk" class could translate into an even larger placement of the developmentally disabled into nursing homes.

Likewise, the Court finds compelling the testimony concerning mortality rates in the community versus in institutions. Dr. Kastner opined that studies indicate that a substantial increase in actual deaths exists as opposed to expected deaths among those placed in the community. Moreover, Dr. Kastner asserted that studies indicate that there is a significant increase in the relative risk of mortality in the community versus in institutions. Dr. Conroy, who testified in support of community place-

ment of all persons with developmental disabilities, admitted that questions remain about whether the mortality rate of people in the community is greater than in institutions. Retired Chief Justice Fones of the Tennessee Supreme Court expressed his concern about the possible closure of ADC when he stated that

> [t]he 242 residents there are the most severely impaired in the mental health system, and removing them from the care they are receiving at Arlington is the equivalent of issuing 242 death certificates. Those human beings cannot survive in any environment providing less professional care than they receive at Arlington.

While this Court is uncertain that the closure of ADC would result in such a tragic situation, the Court cannot take lightly expert testimony that indicates that an increase in mortality rates exists in the community. Nor can the Court cavalierly ignore the observations and the real life stories of the guardians and family members who live with these issues daily. Theirs is not a clinical or hypothetical assessment, but rather a living testament. Accordingly, for the above reasons, this Court concludes that the concerns of the class members and other interested parties weighs heavily against the Court's approval of the proposed MSA.

### E. *Factor Seven: The Public Interest*

■ The public interest in this case is insuring that class members who are developmentally disabled receive appropriate care in accordance with their Constitutional rights. Whether the proposed M.S.A. § is in the public interest necessarily revolves around the proposed closure of ADC. This Court must determine, therefore, whether the closure of ADC will permit those that are the most medically and behaviorally fragile to receive sufficient care.

■ "[W]hen a person is institutionalized and wholly dependent on the state ... a duty to provide certain services and care [ ] exists...." *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Pursuant to the Due Process Clause of the Fourteenth Amendment, the State has:

> a duty to provide *adequate food, shelter, clothing and medical care. These are the essentials of the care the state must provide.* The State also has the unquestioned duty to provide *reasonable safety for all residents* and personnel within the institution... *[Residents maintain] constitutionally protected interests in the conditions of reasonable care and safety,* reasonable non-restrictive confinement conditions, and such training as may be required by these interests.

*Id.* at 324, 102 S.Ct. 2452 (emphasis added); *see also Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 127, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("Due Process Clause of its own force requires that conditions of confinement satisfy certain minimum standards... for persons in mental institutions").

*Youngberg* clearly establishes that the Fourteenth Amendment insures that these class members must receive adequate food, shelter, clothing and medical care from the State. Moreover, the Constitution requires the State to provide reasonable care and safety for all residents. Issues such as the potential lack of appropriate healthcare providers in the community for class members, the potential lack of suitable housing in safe neighborhoods for class members, and the potential increase in mortality rates of class members in the community must be given substantial consideration.

As evidenced by the Remedial Order and the Emergency Orders entered on July 3, 1995 and July 21, 1995, the Court

has endeavored to insure that class members receive adequate medical care by increasing to appropriate ratios the number of physicians and other medical care providers at ADC. *See* Remedial Order, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992); Emergency Order, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992); Order, *United States v. Tennessee,* No. 92–2062 (W.D.Tenn.1992). Furthermore, the Court has closely monitored the deaths of residents at ADC in an attempt to protect other residents from unnecessary harm or death. *Id.* This Court is unwilling to risk the progress thus far achieved for the benefit of the class members by approving a plan that will potentially diminish the Constitutional protection of those class members who are the most in need of increased protection—the medically and behaviorally fragile.

In *Olmstead v. L.C.,* 527 U.S. 581, 601–02, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the United States Supreme Court held that "nothing in the [Americans with Disabilities Act] or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.... Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it." The Court also recognized "the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." *Id.* at 597, 119 S.Ct. 2176. The plurality in *Olmstead* opined that "[f]or many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all their needs is as much liberty as they will ever know." 527 U.S. at 605, 119 S.Ct. 2176 (quoting *Youngberg,* 457 U.S. at 327, 102 S.Ct. 2452.). While not requiring states to provide institutional care, *Olmstead* makes it clear that the Supreme Court recognizes that community placement of the developmentally disabled is not always feasible or wise!

This Court is not satisfied that the State has demonstrated the ability to provide the constitutionally mandated reasonable care and safety in the community to those class members that are the most medically and behaviorally fragile. Accordingly, this Court is unconvinced that the public interest in protecting the Constitutional rights of the class members is served by allowing the proposed closure of ADC without having in place a range of facilities and services for the care and treatment of persons with diverse mental disabilities. The Court concludes that the public interest is better served if ADC remains open in sufficient form for the medically and behaviorally fragile of the class given the questions surrounding the care received in the community setting and the stakes involved with such placement. The constitutional rights of the class members, therefore, weigh heavily in favor of denying the proposed MSA.

## CONCLUSION

■ The factors that weigh against the approval of the proposed M.S.A. § include 1) Plaintiff's likelihood of success on the merits balanced against the relief offered by the proposed settlement, 2) the objections and concerns of the class members and other interested parties, and, most importantly, 3) the public interest in protecting the Constitutional rights of the class members. Given the gravity of the factors that weigh in favor of the denial of this Court's approval of the proposed MSA, the Court finds that the proposed settlement agreement is not fair, adequate, and reasonable. Accordingly, the Court **DENIES** without prejudice the Joint Motion of the parties for approval of the

proposed Mediation Settlement Agreement. The parties are encouraged to develop and present a comprehensive and varied plan that adequately provides for the care and treatment of the medically and behaviorally fragile class.